### In re GRAND JURY PROCEEDINGS.

#### No. 85–6155.

United States Court of Appeals, Sixth Circuit.

Argued March 5, 1986.

Decided July 31, 1986.

Rehearing and Rehearing En Banc Denied Sept. 19, 1986.

---

18. 647 F.2d at 866.

Jay Topkis, Paul, Weiss, Rifkind, Wharton & Garrison, Jeffrey Slade, Meister, Leventhal & Slade, New York City, A.J. Jolly, Jolly & Blau, Newport, Ky., Lawrence S. Bader, argued, New York City, for appellant.

Hays Gorey, Jr., Vicki Plaut, U.S. Dept. of Justice, Anti-Trust Div., Washington, D.C. John J. Powers, III, Andrea Limmer, argued, Gary S. Humble, for appellee.

Before JONES, WELLFORD and NELSON, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendants appeal the district court's denial of their pretrial motion to dismiss the indictment against them. They assert that this prosecution is barred by the double jeopardy clause because the conspiracy charged in the indictment is allegedly part of a conspiracy for which they have earlier been tried. The court below concluded that separate conspiracies exist. We agree and affirm.

On June 14, 1984, a federal grand jury sitting in Covington, Kentucky, indicted Lord Electric Company (Lord Electric), two of its executives, Peter Matthews and Donald McCabe, and Wente Construction Company (Wente Construction) for conspiring to rig bids on the electrical work for Unit II of the Spurlock Generating Station (Spurlock), a coal-fired electrical power plant in Maysville, Kentucky. The indictment charged a violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and two counts of mail fraud, 18 U.S.C. § 1341 (1982). Wente Construction pled guilty; McCabe is awaiting trial. Only Lord Electric and Matthews are involved in this appeal.

The indictment alleged, and testimony before the grand jury tended to show, the following facts. In the week before the May 9, 1978 bid date on the Spurlock project, Matthews telephoned Robert Vandivender, then the director of a six-state regional division of The Howard P. Foley Company (the Foley Company) based in Richmond, Virginia. Vandivender was preparing to bid on Spurlock in a joint venture with Wente Construction. Matthews asked him to "support" Lord Electric's bid on the project, a euphemism that means to submit a higher bid than Lord Electric to insure that Lord Electric would get the contract. Vandivender agreed, in part because he believed Lord Electric had supported his division of the Foley Company in a 1976 project in Virginia called Union Camp. Vandivender said he would have to get consent from Wente Construction, however, and he spoke with Elton Arment, then president of Wente Construction. Arment then telephoned Matthews and the two agreed that in exchange for Wente Construction's "support," Lord Electric would pay Wente $50,000 to cover Wente's costs incurred in preparing the bid. This payment was agreed to allegedly because, unlike the Foley Company, Wente Construction had had no previous "favor" from Lord Electric. The $50,000 was later paid through two false invoices sent by Wente Construction to McCabe at Lord Electric.

After reaching this agreement with Arment, Matthews phoned Vandivender and gave him the figure that the Foley/Wente joint venture should bid. Vandivender testified that he had independent control of his regional division of the Foley Company and therefore he did not consult with his superiors when he decided to consent to Matthews' request. Lord Electric was awarded the contract on a bid of $9,176,000; the Foley Company and Wente Construction had originally been prepared to bid $7,840,000.

Lord Electric and Matthews moved to dismiss the indictment on double jeopardy grounds. One basis of the motion was that this alleged conspiracy is linked to another alleged conspiracy involving bid-rigging on three nuclear power plants in the states of Washington and Indiana, of which the defendants had previously been tried and acquitted. Alternatively, they argued that the government's evidence shows that the Spurlock agreement was part of a larger "superconspiracy" to rig bids on electric projects across the country by the five largest electrical contractors in the nation, and, having already been tried for part of that superconspiracy, they cannot be indicted for another part. The motion was submitted on a voluminous documentary record to a magistrate who ruled that (1) the defendants had made a non-frivolous showing on their first theory, but that the Government had sufficiently rebutted it, and (2) the defendants had not made a non-frivolous showing on the superconspiracy theory, but, even if they had, it was rebutted. The district court adopted the magistrate's findings except that it ruled that a non-frivolous showing had been made on the second theory as well, entitling the defendants to an immediate review of the rejection of both theories. *See Abney v. United States*, 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977).

The defendants also appeal the court's refusal to grant access to certain transcripts from other grand juries, which they claim would be material in presenting their superconspiracy argument. Finally, the defendants argue that the magistrate erred in not granting them an evidentiary hearing on their motion to dismiss.

# I

The double jeopardy clause of the fifth amendment prohibits multiple prosecutions for the same offense. Thus if the conspiracy charged in this case and the conspiracy of which the defendants were indicted and acquitted in another case were both part of a single agreement, this indictment is barred and must be dismissed. *See Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942). The burden is on the defendant to show that a single conspiracy exists, but, because the government typically has better access to evidence, that burden is satisfied if the defendants advance a non-frivolous or prima facie showing of a single conspiracy. *United States v. Jabara*, 644 F.2d 574, 576–77 (6th Cir.1981). The burden then shifts to the government to show separate conspiracies by a preponderance of the evidence. *Id.* In conspiracy prosecutions, the multiple/single conspiracy issue is determined by applying a "totality of the circumstances" test rather than the more limited "same evidence" test normally applied to double jeopardy reviews of substantive offenses. *Id.* at 577; *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir.1983). This test requires the trial court

> to consider the elements of: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

*Sinito*, 723 F.2d at 1256. The ultimate question is whether the evidence shows one agreement or more than one agreement. The finding of fact by the lower court that the government had proven by a preponderance of the evidence that multiple con-

spiracies existed can be set aside only if it is clearly erroneous. *Jabara,* 644 F.2d 577. The reviewing court is bound to accept this finding unless it "is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1958)).

### A.

### Theory I: Spurlock and the WPPSS Conspiracy

In 1983 defendants Lord Electric and Matthews were indicted, along with five other companies and their representatives, of conspiring to rig bids on three nuclear power plants in Washington and Indiana. The plants were the Washington Public Power Supply System (WPPSS) 1 & 4, WPPSS 3 & 5, both in Washington, and Marble Hill in Indiana. According to the indictment in that case, the conspirators allocated the WPPSS 1 & 4 project to a joint venture of the Foley Company and Wismer & Becker Contracting Engineers on a bid price of $122 million. The bidding occurred on May 9, 1978, the same day as the Spurlock bidding. The Foley Company was represented in this conspiracy by its national president, Bancroft T. Foley, Jr.; Vandivender and the Richmond office of the Foley Company were not involved. WPPSS 3 & 5 was allegedly assigned to Fischbach and Moore, Inc., on a $151 million bid; the bidding took place in December 1978 and again in August 1979. L.K. Comstock and Company was originally to have joined Fischbach and Moore on this project but withdrew. The Marble Hill project was allegedly given to a joint venture of Lord Electric and Commonwealth Electric Company, but it was not until a third round of bidding (necessitated by job specification changes) that Lord/Commonwealth had the lowest bid and obtained the contract. The bidding occurred between June 1978 and January 1979; the award price was $98 million.

The agreement to divide these projects among the six companies allegedly arose at meetings among company executives in April and May of 1978 in Palm Springs and Long Beach, California. Matthews was present at each meeting. Testimony at trial, which was held in Montana, indicated that the rigging of the two WPPSS projects was specifically discussed at these meetings, but only one participant could recall that Marble Hill was mentioned and he could recall no agreement about it. There was no evidence that Spurlock was mentioned at the meetings. Testimony also showed that, as a result of Lord Electric's support of the Foley Company/Wismer & Becker bid on WPPSS 1 & 4, the Foley Company would owe Lord Electric an unspecified "favor." It was the government's theory in the Montana case that Marble Hill was the "favor" or *quid pro quo* for WPPSS 1 & 4.

In the present case, the defendants contend under their first theory that Spurlock was the *quid pro quo* for WPPSS 1 & 4. If this were true it would establish that the bid-riggings of both projects were the products of one agreement. The evidence in support of the defendants' prima facie claim on this theory is circumstantial. They first attack the government's theory in the Montana trial that Marble Hill was the consideration for WPPSS 1 & 4. They point to the fact that only one Montana witness could recall that Marble Hill was discussed at the California meetings and none could say that an agreement was reached concerning that project. Further they note that Lord Electric did not emerge as low bidder on Marble Hill until the third round of bidding. These facts tend to show that Marble Hill was not rigged, or at least not as an exchange for WPPSS 1 & 4, thus opening the door for Spurlock to fit that bill. Second, the defendants assail the implication inherent in Vandivender's grand jury testimony that Lord Electric's support for the Foley Company on the Union Camp project was the reason Vandivender agreed to support Lord Electric on the Spurlock bidding. The defendants stated that they could offer evidence that Union Camp was in fact not rigged.

Even if both of these assertions were borne out it would not take the defendants' claim very far. The assertions establish no more than that Marble Hill was not the "favor" that the Foley Company owed to Lord Electric and that Spurlock could have served that function. If these were the only bases for the defendants' claim of a single conspiracy, we would not agree that the defendants had met their initial burden of putting forth a non-frivolous claim. The strength of the defendants' prima facie showing lies in other circumstances: Matthews allegedly knew that the Foley Company owed Lord Electric a favor as a result of the WPPSS 1 & 4 agreement at the California meeting; when Matthews was receiving from the Foley Company the price Lord Electric should bid on WPPSS 1 & 4, he was at the same time phoning Vandivender at the Foley Company to seek support for and arrange the Spurlock bidding; and WPPSS 1 & 4 and Spurlock were bid on the same day. These circumstances are sufficient to create a non-frivolous showing. We now turn to the *Sinito* factors to determine whether the court was correct in ruling that the government has rebutted this showing by proving the existence of multiple conspiracies by a preponderance of the evidence.

The first *Sinito* factor, time, seems facially to work strongly against the government's case: the agreements and bidding on both the Spurlock and WPPSS 1 & 4 projects occurred at the same time. The importance of this factor in bid-rigging cases is somewhat diminished, however, for the conspirators cannot control the timing of their activities. Bids can be rigged only when bids are solicited by the victims. Therefore, the coincidence of these two agreements in time is as likely to be fortuitous as it is to be interdependent.

The second factor, overlap of conspirators, supports the government's position. On the corporate level there was significant overlap. Lord Electric and the Foley Company, by name, were involved in both agreements. Watson-Flagg Electric Company, a subsidiary of Fischbach and Moore, which had been "given" the WPPSS 3 & 5 project, bid on Spurlock. On the other hand, two other Spurlock bidders, Wente Construction and Sargent Electric Company, were not involved in the Montana case, while three Montana participants, Comstock, Commonwealth and Wismer & Becker, did not bid on Spurlock. On an individual level, however, the overlap is less significant. While Matthews at Lord Electric was directly involved in both agreements, he dealt with distinct individuals at the Foley Company. Bernard Foley, the national president, was involved in the WPPSS 1 & 4 arrangements but not in the Spurlock transaction, and Vandivender, who was autonomously in charge of his regional division, made the agreement on Spurlock with Matthews without consulting other Foley company officials. There was no evidence that Vandivender was aware of the WPPSS 1 & 4 scheme. The other individuals involved in Spurlock, Wente Construction's Arment and Lord Electric's McCabe, were also not involved in WPPSS 1 & 4. Matthews, although a key player in both agreements, represents the only overlap among personnel to appear on the record, thus attenuating the circumstantial link between the two projects.

The third *Sinito* factor, the offenses charged, tends to show a single conspiracy because precisely the same statutory offenses—violations of section 1 of the Sherman Act—are alleged in each indictment.

We will skip ahead in this analysis to *Sinito* factor five, location. Like the time factor, the location of projects that are to be rigged is a fortuitous element not in the control of the conspirators. Thus, the fact that the WPPSS and Spurlock projects were in different regions of the country does not necessarily indicate separate schemes. On the other hand, it is noteworthy that, although the participants could not choose the venues of their schemes, the WPPSS 1 & 4 project in fact took place in a region over which Vandivender had no control or interest. Vandivender testified to the grand jury that he received a commission on work performed by his division of the Foley Company. WPPSS 1 & 4 could

yield him no commission because it was not within his region, making it unlikely that he would relinquish a commission on Spurlock on account of the WPPSS 1 & 4 agreement.

The fourth factor, the nature and scope of the activities, is the most indicative of separate conspiracies. While both indictments alleged bid-rigging of electrical power plants, the two types of projects involved are vastly different in size and complexity. The winning bids in the Montana case ranged from $98–151 million, figures that dwarf the $9 million that Lord Electric received on the Spurlock contract. Further, the time and resources that the companies committed to performing the contracts in the Montana case, which involved nuclear power plants, would seem to have little in common with the amount and type of work required for the Spurlock coal-fired plant. Matthews had testified in the Montana case that the executives "discussed nuclear projects" at the California meetings and the problems that were "unique to large projects and especially unique to nuclear projects." A reasonable inference from these statements is that the major nuclear projects in the Montana case were distinct in scope and nature from the conventionally-powered Spurlock project.

In conclusion, our analysis of the five *Sinito* factors compels us to conclude that the lower court's finding that the Montana indictment and the indictment in this case allege separate conspiracies is not clearly erroneous and must be upheld.

**B.**

**Theory II: the "Superconspiracy"**

■ Lord Electric and the four other major electrical contractors in the nation have, among them, been the targets of at least six indictments across the country all alleging conspiracies to rig bids on large electrical contracting projects. The defendants contend that the government's allegations and evidence, if believed, show the existence of a single, broad conspiracy among these five industry leaders and that the separately indicted schemes are the by-products or results of this one "superconspiracy." They argue that the government has artifically carved up this broad conspiracy, and, as a result, the defendants have been twice indicted for the same offense.

The defendants' theory here differs from their first theory in one major respect. While their first argument proposed a horizontal link between the Spurlock agreement and the Montana conspiracy, they argue here that all of the indicted conspiracies are linked vertically to a common broader agreement. In other words, the defendants argue here that while the direct connection between WPPSS 1 & 4 and Spurlock may not be so close that the two were mutually dependent on each other, they are both issue of the same parent and that relationship is enough to invoke the protection of the double jeopardy clause.

In the proceedings below, the defendants relied primarily on *United States v. Beachner Construction Co.*, 729 F.2d 1278 (10th Cir.1984), to meet their burden of showing a non-frivolous claim of double jeopardy. *Beachner* involved bid-rigging of highway construction projects in Kansas. The defendants there had been tried and acquitted on charges arising from the rigging of one such project and were subsequently indicted for the rigging of another set of projects elsewhere in the state. *Id.* at 1279. The district court granted the defendants' motion to dismiss the second indictment on double jeopardy grounds on a finding that both indicted schemes "were each part of a single, continuing conspiracy which had existed in Kansas since the early 1960's." *Id.* In affirming the lower court, the court of appeals noted the presence of four factors that indicated the existence of a single, state-wide conspiracy. They were

(1) the existence of common bid-rigging jargon prevalent industry-wide, (2) the participants had no fear of initiating the setup of a bid, (3) the perpetual nature of the bid-rigging scheme, and (4) the existence of a tacit mutual understanding among competitors of a single, continuing conspiracy.

*Id.* at 1282. The court drew this list of factors from *United States v. Consolidated Packaging,* 575 F.2d 117 (7th Cir.1978), where the Seventh Circuit had noted the existence of similar circumstances in holding that an indictment for a nationwide conspiracy to fix prices in the cardboard container industry charged a single conspiracy, not multiple conspiracies, and thus the proof produced no prejudicial variance.

The magistrate in this case considered the four *Beachner* factors, found that they were not present, and ruled, therefore, that the defendants had failed to present a non-frivolous claim. The district court ruled otherwise, concluding without analysis that a non-frivolous showing had been made. We agree with the district court's implicit finding that, applying the *Beachner* factors, the defendants have made a non-frivolous showing of at least a tacit understanding among the major contractors that bid-rigging was an acceptable practice in the industry.

The district court went on to adopt the magistrate's alternate finding that the government had rebutted this prima facie case by showing that the nationwide superconspiracy did not in fact exist. This finding was based on an application of the *Sinito* factors to the superconspiracy claim. We do not believe, however, that the *Sinito* factors are useful to the final determination of whether this superconspiracy is or is not shown by the evidence. The *Sinito* analysis is tailored to the task of comparing two indicted offenses, not to the detection of an unindicted broader agreement. We need not decide, however, whether the district court clearly erred in concluding that the superconspiracy did not exist, for we see a more fundamental error in the defendants' argument.

Even if we assume the existence of the nationwide conspiracy and even if we further assume that both the Spurlock agreement and the Montana conspiracy are, in some sense, products of the superconspiracy, the question still remains whether this relationship establishes conclusively that the indicted lesser agreements are one offense for double jeopardy purposes. The *Beachner* court, faced with similar circumstances, assumed that it did without exposition. We believe that this assumption is invalid. In our view, the factual nature of the parent and offspring agreements, and of the relationship between them, must be considered to determine whether the offspring are independent of or dependent on the parent.

In some cases a parent conspiracy may appear to be an ongoing, active agreement. It may be characterized by a long-term agreement to maintain prices or limit production, by a centrally governed system of fixing prices, or by a periodic set of meetings at which industry-wide operations such as the assignment of major projects for the year are determined for the entire region covered by the conspiracy. In most cases the agreement will be expressed. A price-fixing cartel is perhaps the best example of this type of conspiracy. When such an active parent exists, the operative decisions are made at the parent level and the offspring conspiracies are merely implementations of the parent agreement. In these cases the offspring can be characterized as dependent on the parent and only one prosecution can be allowed. If a defendant is tried for the parent conspiracy or for any of the offspring agreements, it may not be indicted again.

In other cases, however, the parent agreement may be passive in nature. It may appear to be no more than an agreement to agree, a willingness to enter into future illegal compacts, or an understanding—expressed or implied—that the participants will be receptive to requests that some future project be rigged or prices fixed. In this kind of case, the offspring agreements that actually bring those passive understandings into fruition are themselves full-blown, self-contained conspiracies, each of which may be subject to a separate indictment. They may have been facilitated or even encouraged by the existence of the parent agreement, but they are independent of it. The offspring conspiracies are distinct violations, and

their common parentage is not enough to prevent their separate prosecution.

In this second class of cases, we think the government is put to an election. It may choose to prosecute the parent conspiracy, or it may charge the individual offspring separately, to the extent that, as here, the lesser conspiracies are not horizontally tied to one another. The government may not do both, however. The offspring agreements are distinct from each other, but the vertical relationship of each to the passive parent conspiracy cannot be denied. Thus, an indictment for the parent conspiracy sweeps within its terms the lesser active progeny and the latter cannot be tried again. Similarly, the trial of one offspring agreement is a trial on part of the passive parent, and the whole cannot be subsequently prosecuted.

A review of the record and the arguments of the defendants show that this is one of the second class of cases. Assuming, without deciding, that the superconspiracy that defendants describe exists, the evidence in the record shows beyond doubt that it was no more than a passive understanding that bid-rigging was an accepted way to do business. It was well known in the industry that the practice occurred, and the means and jargon employed in each agreement were often identical, but agreements to rig individual projects were made only when opportunities arose and, as our summaries of the Spurlock and Montana case transactions show, the arrangements had to be negotiated "from scratch" each time. While these negotiations were sometimes little more than an exchange of code words and figures, there is no evidence that the background understanding was the type of active, controlling super-agreement that would make Spurlock and the others predetermined executions of the general plan. The government has not indicted the nationwide superconspiracy; it has chosen instead to prosecute the lesser agreements individually. We hold that, in view of the nature of the nationwide conspiracy described by the defendants, the conspiracy charged in the indictment before us is, as a matter of law, not the "same offense" as the other offspring conspiracies for which the defendants have been tried or indicted and, therefore, this indictment should not be dismissed.

## II

The defendants assert that the court erroneously denied their motion to compel the government to release to them the transcripts of a pending grand jury investigation. Release was sought under a pretrial stipulation that permitted the defendants access to "all grand jury transcripts material to the preparation of the defense." Specifically, the defendants maintain that these transcripts were material to the presentation of their superconspiracy double jeopardy argument. The magistrate viewed these documents *in camera* along with all other documents submitted by the parties and some additional transcripts requested by the magistrate before ruling on the double jeopardy motion. He concluded that the requested documents gave no support to the defendants' double jeopardy claims and, therefore, were not material to their defense. This finding removes the documents from the scope of the discovery stipulation and, therefore, the denial of the motion to compel was not in error. This does not mean that the magistrate's determination is unreviewable. The district court also examined the documents in dispute and affirmed the magistrate's ruling based on its own review. We find no error in the denial of the motion to require the government to release the defendants' transcripts of the pending grand jury investigation.

## III

The defendants' final assertion of error is that they were wrongly denied an evidentiary hearing on their double jeopardy motion. The defendants correctly state the general rule: once a defendant has put forth a non-frivolous claim of double jeopardy, the court should hold an evidentiary hearing to resolve any factual disputes that arise. *Jabara*, 644 F.2d at 576; *United*

*States v. Inmon,* 568 F.2d 326, 331 (3d Cir.1977). In this case, voluminous documentary evidence, including grand jury transcripts and testimony from the trial of the Montana case, were submitted to the court and transferred to the magistrate for review and recommendation. The defendants, by letter, then requested both an oral argument and an evidentiary hearing on their motion. A hearing was held at which the merits of the motion were argued. Counsel for defendants did not then again request an evidentiary hearing or attempt to enter evidence, although counsel did state he had evidence to present on the issue of whether the Union Camp project was rigged. This hearing was held on October 30, 1984; the defendants made no further request for an evidentiary hearing, or inquiry about when one would be held, until after the magistrate's report was filed on July 2, 1985.

The defendants state that, given an opportunity, they would have presented testimonial evidence to show that the Marble Hill project was not rigged, to help resolve the conflict in the Montana trial testimony on whether Marble Hill was mentioned at the California meetings, and to rebut Vandivender's assertion before the Covington grand jury that the Union Camp project was rigged and served as the *quid pro quo* for the Spurlock agreement. As discussed above, however, *see supra* at 1381–82, these issues were only marginally relevant to the ultimate question of whether Spurlock was the *quid pro quo* from the Foley Company to Lord Electric for the WPPSS 1 & 4 project and findings in favor of the defendants on these issues would not have changed the outcome on their motion.

We do not condone the magistrate's failure to provide an evidentiary hearing, but the circumstances in this case do not warrant reversal on that ground. The defendants' failure to raise their request at the hearing before the magistrate, and for eight months thereafter, indicates that their desire to present live testimony was not as keenly felt then as it is now. The government was not opposing the request and both parties had ample opportunity to

and did present extensive documentary evidence. Finally, the issues that defendants wished to contest at a hearing are not determinative, and we are satisfied that the defendants were not prejudiced by their inability to present them.

The order denying the defendants' motion to dismiss is AFFIRMED and the case is REMANDED for further proceedings.