RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 14-6013/15-5037

MANILA VICHITVONGSA, aka Manee Vichitvongsa, Nelly,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:11-cr-00204—Aleta Arthur Trauger, District Judge.
No. 3:12-cr-00013—Todd J. Campbell, District Judge.

Argued: January 28, 2016

Decided and Filed: April 4, 2016

Before: GRIFFIN and STRANCH, Circuit Judges; and GWIN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Luke A. Evans, BULLOCK, FLY, HORNSBY & EVANS, Murfreesboro, Tennessee, for Appellant. Philip H. Wehby, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Luke A. Evans, BULLOCK, FLY, HORNSBY & EVANS, Murfreesboro, Tennessee, for Appellant. Philip H. Wehby, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

————————

**OPINION**

————————

GRIFFIN, Circuit Judge.   This consolidated appeal raises an important issue regarding the application of 18 U.S.C. § 924(c)(1)'s criminalization of the use, carry, or possession of a firearm during the commission of two simultaneous conspiracies.   For his role in two separate armed robberies, a jury convicted defendant Manila "Nelly" Vichitvongsa of two counts of conspiring to commit Hobbs Act robbery, two counts of conspiring to traffic drugs, and *four* counts of using a firearm to further these conspiracies in violation of § 924(c) (two for each robbery).   As a matter of statutory interpretation, we hold that the simultaneous violation of two federal conspiracy statutes cannot support two § 924(c) charges on the sole basis of one firearm use.   Our conclusion is premised upon our en banc opinion in *United States v. Johnson*, 25 F.3d 1335 (6th Cir. 1994) (en banc), and supported by the decisions of our sister circuits, *see United States v. Rentz*, 777 F.3d 1105, 1114 (10th Cir. 2015) (collecting cases).   The district court thus erred in not dismissing one § 924(c) count for each robbery.   Accordingly, we vacate two of defendant's § 924(c) convictions, but affirm in all other respects.

I.

*Case Number 15-5037*

Within the span of two weeks in June 2011, defendant Vichitvongsa planned and executed two armed robberies (in LaVergne and Smith County, Tennessee) with several co-conspirators with the hopes of stealing hundreds of thousands of dollars and large amounts of illegal drugs from two drug dealers.   Each robbery was violent.   They ransacked houses, restrained and beat victims, and shot one man in the chest.   Neither robbery accomplished what defendant and his co-conspirators intended; they failed to locate money and drugs, and instead resorted to stealing a few miscellaneous items.

The LaVergne Robbery

On June 11, 2011, defendant met several co-conspirators outside a restaurant in suburban Nashville. There they planned to rob the residence of Chris Leggs, a cocaine dealer. Leggs's residence was in LaVergne, a neighboring suburb. They believed it contained hundreds of thousands of dollars and several kilograms of cocaine. Co-conspirator Nickless Whitson came up with the idea to rob the house, and he and defendant told the others about the amount of money and cocaine they expected to be at the house.

The co-conspirators then drove to the house. Two caused a distraction, while the others forced their way inside. Four carried guns, including defendant. They threatened and assaulted the sole occupant, Dominique Baker, and tied her up while they ransacked the house. After searching for money and drugs for 30 to 45 minutes to no avail, they took a few guns and jewelry, and left.

The Smith County Robbery

About two weeks after the LaVergne robbery, Vichitvongsa and others concocted a plan to rob Daniel Crowe's house, a marijuana dealer in Smith County, Tennessee. William Byrd had purchased marijuana from Crowe to sell on a by-the-pound basis. Byrd, who did not play a role in the LaVergne robbery, told defendant that he was "under the impression that there was a large amount of money" at Crowe's house, "[a]round $300,000." Although Byrd never told defendant there was marijuana at Crowe's house, defendant told others there would be extensive amounts of marijuana there. Defendant indicated he wanted to rob the house, and a few days before the robbery, Byrd escorted Whitson and defendant to the house for reconnaissance purposes.

On June 27, 2011, the robbers met at a Home Depot, purchased zip ties, and caravanned to Crowe's residence. Four, including defendant, entered the house—armed—while two remained outside. They tied up Crowe's mother and stepfather, Lorraine and William Webb, and began searching the house. The robbers threatened to harm the Webbs, with one suggesting they light Lorraine Webb on fire. William Webb eventually freed himself and lunged with a plastic sheath at a robber, who shot him in the chest. Others fired shots as well. The robbers fled

shortly thereafter, taking items they found in the house—including guns and grow lamps—in the Webbs's car.

For each robbery, a grand jury charged Vichitvongsa with four counts, for a total of eight: two counts of conspiring to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951 (Counts 1 and 5); two counts of brandishing/discharging a firearm during a conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 924(c)(1) (Counts 2 and 6); two counts of conspiracy with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Counts 3 and 7); and two counts of brandishing/discharging a firearm while drug trafficking in violation of 18 U.S.C. § 924(c)(1) (Counts 4 and 8). A jury convicted defendant of all eight counts. The district court denied Vichitvongsa's post-verdict motion for acquittal, and sentenced him to a total term of 1,219 months' imprisonment. Pursuant to 18 U.S.C. § 924(c)(1)(A), (C), and (D), his first § 924(c) offense was subject to an 84-month statutory minimum, and each subsequent offense was subject to a 300-month statutory minimum, each running consecutively. Accordingly, 984 months of his 1,219-month sentence arose from his § 924(c) convictions.

Vichitvongsa raises four issues on appeal in Case No. 15-5037. His primary contention is that § 924(c) does not support four convictions when he only made two choices to use a gun (one for each robbery), and that such convictions violate his constitutional right against double jeopardy. Defendant raises three other issues on appeal: the sufficiency of the evidence supporting an interstate nexus to sustain his Hobbs Act convictions; whether his multiple conspiracy convictions violate double jeopardy; and the reasonableness of his 1,219-month sentence.

II.

First, we address defendant's primary issue on appeal. Section 924(c)(1)(A) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be subject to additional and consecutive imprisonment. Because he simultaneously used only one firearm during the commission of two simultaneous conspiracies (Hobbs Act robbery and drug trafficking), defendant claims he wrongly received two § 924(c) counts for each robbery.

We agree with Vichitvongsa that the application of multiple § 924(c) charges under these circumstances is contrary to the law. Accordingly, we need not reach defendant's double jeopardy challenge. *See Johnson*, 25 F.3d at 1337.

This case presents an issue of first impression in our circuit: whether a defendant can be convicted of violating § 924(c) twice on the sole basis of using the same firearm *one* time to simultaneously further *two* different conspiracies. In the double jeopardy context, most of our case law involves either the use of multiple firearms in relation to a single offense, *see, e.g.*, *United States v. Taylor*, 13 F.3d 986, 992 (6th Cir. 1994), or multiple uses of one or more firearms in the context of ongoing criminal activity, *see, e.g.*, *United States v. Burnette*, 170 F.3d 567, 572 (6th Cir. 1999); *United States v. Nabors*, 901 F.2d 1351, 1357–59 (6th Cir. 1990). In these cases, we have focused on the nature of the predicate offenses, holding that "924(c)'s unit of prosecution is the underlying offense, not the number of firearms." *Taylor*, 13 F.3d at 994; *see also United States v. Graham*, 275 F.3d 490, 519–20 (6th Cir. 2001) ("We have upheld multiple convictions and sentences under 18 U.S.C. § 924(c)(1) so long as such convictions are based on separate predicate acts."); *Nabors*, 901 F.2d at 1357–58 ("Nabors's two convictions under § 924(c)(1) do not each require the same proof of facts; the two predicate offenses are distinct and require proof of facts not required by the other predicate. Thus, no problem of multiplicity exists under *Blockburger v. United States*, [284 U.S. 299, 304 (1932)].").

Upon close examination of Vichitvongsa's conduct, this "underlying offense" case law does not control. Instead, this is one of those limited circumstances that is guided by our en banc decision in *Johnson*, where we examined "[t]he narrow question . . . [of] whether a defendant may be sentenced to two or more consecutive terms for violating 18 U.S.C. § 924(c)(1) by possessing firearms while simultaneously trafficking in two or more controlled substances under 21 U.S.C. § 841." 25 F.3d at 1336 (footnote omitted). In *Johnson*, agents executed a search warrant at Johnson's home and found two firearms and two different controlled substances, cocaine and Dilaudid (hydromorphone). *Id.* A jury convicted defendant of two § 924(c) charges, one for each type of drug possessed. *Id.*

As here, we declined to reach the issue of "whether possessing separate controlled substances simultaneously is one predicate offense rather than two" under *Blockburger*'s

multiplicity test and instead addressed the issue on statutory grounds. *Id.* at 1337. We focused on the "absurdity" presented by Johnson's simultaneous possession of two drugs serving as a predicate for two § 924(c) charges given the statute's ambiguity:

> Our [case law] shows that . . . hair-splitting [between predicate offenses and § 924(c) charges] sometimes leads to absurd results, which "makes it unreasonable to believe that the legislat[ure] intended to include the particular act." *The absurdity is that a defendant with one firearm and one marijuana joint, one rock of crack, and one Dilaudid would receive fifteen years . . . for the gun in addition to the sentence on the drug charges, assuming the drugs were possessed with intent to distribute, while a drug kingpin with ten kilos of crack and the same firearm would only receive one five-year sentence, consecutive to his sentence for the drug offense.* Therefore, we look to other evidence of congressional intent to determine the resolution of this case.

*Id.* at 1338 (emphasis added and citations omitted). Congressional intent was "not clear" as applied to Johnson—"Congress's intention was clear that if an offender 'uses his gun and is caught and convicted, he is going to jail. He should further understand that if he does so a second time, he is going to jail for a longer time.'" *Id.* (citation omitted). Accordingly, we held that the only "sensible construction" of § 924(c) in light of Johnson's simultaneous drug possession was that "possession of one or more firearms in conjunction with predicate offenses involving simultaneous possession of different controlled substances should constitute only one offense under § 924(c)(1), and the sentences under § 924(c)(1) should be for one offense only." *Id.* (citing *Taylor*, 13 F.3d at 994).

The rationale of *Johnson* applies to the instant case. Johnson took *one* affirmative firearm act (possessing guns) while simultaneously committing *two* predicate offenses (possessing two controlled substances), and this was not enough to substantiate *two* § 924(c) convictions. Similarly, in each robbery, Vichitvongsa took *one* affirmative firearm act (brandishing a handgun) while simultaneously committing *two* predicate offenses (conspiring to commit Hobbs Act robbery and to traffic drugs), and this does not support *two* § 924(c) convictions. Stated differently, replace conspiracy to commit Hobbs Act robbery and conspiracy to traffic drugs with possession of cocaine and possession of Dilaudid, and we have *Johnson*.

It is understandable that the district court examined Vichitvongsa's underlying criminal conspiracy convictions to find no issue with his multiple § 924(c) convictions for each robbery.[1] After all, his predicate offenses have different elements and thus, on a surface-level, his conduct appears to fit within our "underlying offense" case law developed in *Nabors*, *Burnette*, and *Graham*. But these authorities are distinguishable. Each focused on the predicate offenses because whether there was more than one use, carry, or possession was not at issue.

For example, in *Nabors*, the case the government identified at oral argument as its best case, Nabors shot an ATF agent with a rifle during the execution of a search warrant. 901 F.2d at 1353. A subsequent search produced the rifle, a pistol, ammunition, crack cocaine, and drug distribution paraphernalia. *Id.* A jury convicted Nabors of two § 924(c) charges, one for possessing drugs with the intent to distribute and one for shooting the ATF agent.[2] *Id.* We affirmed his two § 924(c) charges because the predicate offenses were "distinct and require[d] proof of facts not required by the other predicate." *Id.* at 1358. Implicit in this finding, however, is that Nabors used firearms twice, once to shoot a federal agent on the date police executed a search warrant, and once to "facilitate and protect drug transactions" during his possession of cocaine. *Id.* at 1357–58. Accordingly, Nabors's multiple and non-simultaneous firearm use is distinguishable from Vichitvongsa's singular use.

*Burnette* and *Graham* are distinguishable as well. In *Burnette*, the defendant used a gun to kidnap hostages one day and to effectuate a bank robbery the next, and a jury convicted him of two § 924(c) charges: one for kidnapping and one for bank robbery. 170 F.3d at 568, 571–72. We affirmed those convictions, noting "the kidnapping occurred significantly before, and independent of, the actual bank robbery, rather than being in any way simultaneous." *Id.* at 572. *Graham* expressly draws on *Burnette* by distinguishing the predicate offenses involved as

---

[1]We are not the only court whose broad language has been read this way. *See, e.g.*, *United States v. Cureton*, 739 F.3d 1032, 1042 (7th Cir. 2014) ("Read out of context, some of our language . . . might suggest that so long as there are different predicate offenses, like here, multiple § 924(c) convictions can result.").

[2]Under our "fortress theory" case law at that time, Nabors's "weapons found in the apartment were in [his] actual and constructive possession and were used to facilitate and protect drug transactions. Consequently, those firearms [were] considered to have been used during and in relation to the drug trafficking offense of possession of cocaine with the intent to distribute." 901 F.2d at 1358. The Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995), and Congress's response to *Bailey* have altered this theory's application. *See United States v. Seymour*, 739 F.3d 923, 929–30 & n.3 (6th Cir. 2014).

distinct events occurring over different time periods. 275 F.3d at 520–21. In that case, the defendant carried one gun while tending his marijuana patches (drug trafficking), and stockpiled several others while planning to attack various places and individuals, including several federal officials (conspiring to commit crimes against the United States). *Id.* at 497–98, 520. Section 924(c) authorized two separate charges because "Graham's predicate offenses were not committed simultaneously, nor did they consist of identical conduct." *Id.* at 521. In short, the defendants in *Burnette* and *Graham* clearly chose to use a firearm more than once. In contrast, Vichitvongsa chose to use a firearm once during each robbery to simultaneously further two conspiracies.

In sum, *Johnson* is best understood as refining *Taylor*'s statement that "924(c)'s unit of prosecution is the underlying offense, not the number of firearms." 13 F.3d at 994. Thereafter, and as illustrated by *Burnette* and *Graham*, we look not to the number of firearms, but rather to the facts and circumstances driving the underlying offense. Yet, the exclusion of the number of firearms cannot be equated with eliminating § 924(c)'s use, carry, or possess requirement. Citing *Taylor* with approval, *Johnson* perfects *Taylor*'s approach in its application: courts must look *both* at the offense upon which a § 924(c) charge rests *and* § 924(c)'s express language linking a firearm to the predicate offense—the defendant's use, carry, or possession. We therefore make explicit what *Johnson* made implicit. In order for the government to convict a defendant of more than one § 924(c) charge, the defendant must use, carry, or possess a firearm—even if it is the same one—more than once.

Our sister circuits are in accord. The Tenth Circuit's recent discussion in *Rentz*, 777 F.3d at 1105, which thoroughly examined § 924(c)'s unit of prosecution in a case involving whether the act of firing one gunshot (wounding one and killing another) resulting in two crimes of violence (assault and murder) supported two § 924(c) charges, is persuasive. As discussed in *Rentz*, the other circuits to have addressed this issue on statutory grounds are also in agreement. *Id.* at 1114 (*comparing Cureton*, 739 F.3d at 1044, *United States v. Phipps*, 319 F.3d 177 (5th Cir. 2003), *United States v. Finley*, 245 F.3d 199 (2d Cir. 2001), *United States v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998), *with United States v. Sandstrom*, 594 F.3d 634 (8th Cir. 2010)).

We highlight just a short portion of the Tenth Circuit's comprehensive textual analysis. It begins by noting § 924(c)'s construction starts with the operative verbs: uses, carries, and possesses. *Id.* at 1109. These verbs tell us that before § 924(c) criminalizes the furtherance of certain crimes, one must use, carry, or possess a firearm. *Id.* "So reading § 924(c)(1)(A) . . . in accord with the normal rules of statutory (and sentence) construction goes some way to suggest that every new conviction requires a new act falling into one of those three categories." *Id.* And, given the adverbial prepositional phrases that further refine which verb § 924(c) criminalizes, i.e., "during and in relation to any crime of violence or drug trafficking crime" and "in furtherance of any such crime," it follows that "each § 924(c)(1)(A) charge must involve *both* an act of using, carrying, or possessing *and* that such an act must come during and in relation to (or in furtherance of) a qualifying crime." *Id.* at 1109–10.

Finally, the Tenth Circuit, as with others, reasoned that when interpreting criminal statutes, "we don't default to the most severe possible interpretation . . . but to the rule of lenity":

> The rule of lenity seeks to ensure legislatures, not prosecutors, decide the circumstances when people may be sent to prison. It seeks to ensure, too, that if a legislature wishes to attach criminal consequences to certain conduct—to deprive persons of their property, liberty, or even lives—it provides fair warning. Of course, Congress is free if it wishes to amend § 924(c)(1)(A) to state that a second conviction doesn't require a second use, carry, or possession. But unless and until it does, we will not relegate men and women to prison (or to decades more time in prison) because they did something that might—or might not—have amounted to a violation of the law as enacted.

*Id.* at 1113. Therefore, "the government must prove both a use, carry, or possession, *as well as* a qualifying crime." *Id.* (emphasis added).

We emphasize the narrowness of our decision in light of *Johnson* and our prior precedent. We do not hold that multiple crimes with one firearm occurring during "the same criminal episode" may support only one § 924(c) charge. On this point, we have been quite clear. *See, e.g.*, *Burnette*, 170 F.3d at 572 ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode are lawful."); *accord Graham*, 275 F.3d at 520. Whether a criminal episode contains more than one unique and independent use, carry, or possession depends at least in part

on whether the defendant made more than one choice to use, carry, or possess a firearm. *See Rentz*, 777 F.3d at 1111–12; *Cureton*, 739 F.3d at 1043; *Phipps*, 319 F.3d at 187; *Finley*, 245 F.3d at 207. Vichitvongsa's conduct thus stands as one of those circumstances where prosecutors, grand juries, and judges must closely examine *both* the predicate crimes *and* the charged firearm *use*, *carry*, or *possession* to properly support multiple § 924(c) charges.

Because the district court erred in not dismissing one of defendant's § 924(c) counts for each robbery, and because the proper penalties are the same given § 924(c)'s mandatory term (regardless of which two of the four counts are vacated), *Taylor* instructs that we remand to the district court for the limited purpose of entering a revised judgment and sentence consistent with this opinion. 13 F.3d at 994.

III.

Next, defendant claims that his Hobbs Act convictions lack the necessary interstate nexus. The Hobbs Act makes it a crime to conspire to "obstruct[], delay[] or affect[] commerce or the movement of any article or commodity in commerce, by robbery." 18 U.S.C. § 1951(a). To convict defendant for violating the Hobbs Act, the government was required to prove defendant: (1) interfered with interstate commerce; and (2) conspired to commit robbery. *United States v. Turner*, 272 F.3d 380, 384 (6th Cir. 2001). Vichitvongsa contends the government failed to present sufficient proof as to the interstate nexus, and thus the district court erred in denying his motion for judgment of acquittal. Finding no error, we affirm.

We review a district court's denial of a motion for judgment of acquittal de novo, assessing "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In so doing, we draw "all reasonable inferences in support of the jury's verdict and will reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably

inferred." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015) (citation omitted). "In sum, a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).

"The Supreme Court has held that the Commerce Clause provision of the Hobbs Act is extremely broad." *United States v. Watkins*, 509 F.3d 277, 281 (6th Cir. 2007) (citing *Stirone v. United States*, 361 U.S. 212, 215 (1960)). Generally, we require only a *de minimis* connection to interstate commerce to satisfy the Hobbs Act. *See United States v. Davis*, 473 F.3d 680, 681–82 (6th Cir. 2007). Under this "low threshold . . . [, t]here is no requirement that there be an actual effect on interstate commerce—only a realistic probability that [an offense] will have an effect on interstate commerce." *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000) (third alteration in original).

In instances involving a robbery of a private citizen (the so-called "private individual exception"), "the connection to interstate commerce is much more attenuated." *Id.* at 238; *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). It cannot be "fortuitous or speculative," and rather "must be a substantial one." *Wang*, 222 F.3d at 239–40. This would potentially include, for example, the "victimization of a large number of individuals, or victimization of a single individual for a very large sum," as well as when the "defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Id.* at 239–40.

However, we view private citizens engaged in drug crimes differently. "[I]llegal commerce counts as commerce for Hobbs Act purposes." *United States v. Cecil*, 615 F.3d 678, 691 (6th Cir. 2010) (citation omitted). More specifically, "robbing drug dealers is a proper basis for conviction under the Hobbs Act." *United States v. Sease*, 659 F.3d 519, 526 (6th Cir. 2011); *accord United States v. Lanier*, 623 F. App'x 768, 775–76 (6th Cir. 2015); *United States v. Baugh*, 605 F. App'x 488, 490–91 (6th Cir. 2015). Robbing drug dealers who can be "legitimately characterized as engaged in business"—like Leggs and Crowe here—does not fall within *Wang*'s "private individual exception," and thus the government need only show a *de minimis* connection to interstate commerce. *Ostrander*, 411 F.3d at 694.

Our recent cases involving conspiracies to rob drug dealers confirm the district court did not commit reversible error. Take *Ostrander*, for example, where the defendant conspired to rob and kill a drug dealer. *Id.* at 685, 691–92. In sustaining the interstate nexus, we associated dealing large quantities of drugs with operating a business: "[the victim] was a drug dealer; that was his business, and indeed he was the business. He bought and sold marijuana and cocaine. . . . [Defendant] admitted to selling large quantities of marijuana to [the victim] on multiple occasions. . . ." *Id.* at 691. Combined with testimony indicating the drugs the victim sold originated in Latin America, we found a sufficient, *de minimis* connection to interstate commerce. *Id.* at 691–92.

In *Baugh*, the co-conspirators targeted a drug dealer's house for robbery, "expect[ing] to find 'bricks' of [cocaine] at his house." 605 F. App'x at 491. For evidence that cocaine traveled through interstate commerce, witnesses agreed that it "ain't grown in Tennessee." *Id.* In upholding defendant's conviction for conspiring to violate the Hobbs Act, we expressly rejected the argument that there was no evidence that the drug dealer "*actually* dealt drugs. . . . [It] makes no difference in the context of a conspiracy because it requires proof only that the scheme would have affected commerce had it succeeded." *Id.* (citing *United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir. 1989)).

*Lanier* is even more instructive. In that matter, the defendant conspired to commit three Hobbs Act robberies. 623 F. App'x at 770. He intended to rob "active drug dealers . . . *because of* their drug dealing." *Id.* at 775. As two of the three drug dealers were "engaged in the drug dealing business at the time of the robberies" (like *Ostrander*), *Wang*'s private individual exception did not apply. *Id.* The *Lanier* court also held that the conspiracy to rob the third drug dealer, who was incarcerated at the time, qualified because the co-conspirators targeted the "proceeds from drug sales"—about $38,000. *Id.* at 772, 775.

In this case, the evidence supporting an interstate nexus for both robberies is more than enough to conclude "*any* rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. As for the LaVergne robbery, defendant and his co-conspirators targeted the residence of a cocaine dealer, believing it contained hundreds of thousands of dollars and several kilos of cocaine. Similarly, the target of the Smith County

robbery testified that he trafficked in large quantities of marijuana for a period of years, obtaining it from several parts of the country.  Some of the marijuana he obtained was from Canada, known as "BC Bud."  The government also presented evidence, through Special Agent Matthew Chance's testimony, that cocaine is not produced in Tennessee, originates from South America, and usually travels into the United States via Mexico.  Chance provided similar testimony with regard to marijuana, and agreed that if someone was "trafficking BC Bud[, they] would have to reach outside of [Tennessee] in order to obtain it."  These facts are sufficiently analogous to *Ostrander*, *Baugh*, and *Lanier*.

Defendant attempts to satisfy his very heavy burden by relying upon *Wang* and *Turner*, but these cases did not involve interstate drug trafficking.  He additionally cites *United States v. Peterson*, 236 F.3d 848 (7th Cir. 2001), where the Seventh Circuit found no interstate nexus in the robbery of a drug dealer because the government *only* produced evidence that the drugs were not "normally" grown in Indiana and that the robbery diverted money from drug trafficking.  *Id.* at 855.  That was one too many inferences for the Seventh Circuit.  *Id.*  But here, the government produced ample evidence tying Leggs's and Crowe's drug trafficking businesses to interstate commerce.

Vichitvongsa also presents red herrings, noting that the victims of the robberies were all private citizens not involved in drug trafficking, and that the drug dealers both testified that they did not keep drugs or money at their respective houses.  These points miss the mark because "[w]hen a conspiracy is charged under the Hobbs Act, the government need only prove that the scheme would have affected interstate commerce had it been carried out."  *Turner*, 272 F.3d at 384.

Finally, defendant attacks the government's evidence for failing to account for all sufficient alternatives to interstate commerce:  Special Agent Chance "did not testify" that producing cocaine in the United States was impossible; did not test Leggs's cocaine so therefore "could not speak to whether the cocaine in question was genuine or counterfeit"; and agreed marijuana could be grown in Tennessee.  It is true that the government did not account for all of these alternatives.  However, in this posture, we must draw "all reasonable inferences in support of the jury's verdict."  *Stewart*, 729 F.3d at 526.

Given the evidence presented, *any* rational trier of fact could have found the conspiracies to commit the LaVergne and Smith County robberies had a *de minimis* connection to interstate commerce.

IV.

The Constitution's Double Jeopardy Clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. It protects the individual "against a second prosecution for the same offense after conviction or acquittal, and against multiple punishments for the same offense." *United States v. Turner*, 324 F.3d 456, 461 (6th Cir. 2003) (citation omitted). Defendant argues the district court erred in concluding that the robberies were multiple conspiracies (as opposed to a single, continuing conspiracy), thus violating double jeopardy. He contends he should have been charged with just one Hobbs Act conspiracy and one drug trafficking conspiracy, not the two he received for each robbery. We disagree.

We review de novo claims of multiplicity—"charging a single offense in more than one count in an indictment"—in violation of double jeopardy. *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008). In conspiracy cases, like this one, "it is the agreement which forms the nucleus of the offense." *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). "A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce*, 488 U.S. 563, 570–71 (1989). Once a defendant "advance[s] a non-frivolous or prima facie showing of a single conspiracy[, t]he burden then shifts to the government to show separate conspiracies by a preponderance of the evidence." *In re Grand Jury Proceedings*, 797 F.2d 1377, 1380 (6th Cir. 1986) (internal citation omitted). We review a district court's finding that the government showed separate conspiracies by a preponderance of the evidence for clear error. *Id.* at 1380–81 (citing *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981)).

"The ultimate question is whether the evidence shows one agreement or more than one agreement." *Id.* at 1380. We employ a five-factor "totality of the circumstances" test, as set forth in *Sinito*, when evaluating such multiplicity challenges:

> The test requires the trial court, in determining whether two conspiracies arise from a single agreement, to consider the elements of: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

723 F.2d at 1256. "Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses." *Id.* at 1256–57. The scope and nature of the conduct charged—the fourth factor—is the "most significant." *United States v. Goff*, 400 F. App'x 1, 9 (6th Cir. 2010) (citing *United States v. Wheeler*, 535 F.3d 446, 456 (6th Cir. 2008)).

*Time.* The first factor weighs in the government's favor. The two robberies took place in some temporal proximity, about two weeks. However, we focus on the extent to which the time periods covered by the two indictments overlap. *See Wheeler*, 535 F.3d at 450–51; *Sinito*, 723 F.2d at 1257. Overlap in time alone is "not conclusive evidence of a single conspiracy." *United States v. Lacey*, No. 92-1186, 1993 WL 1292, at \*7 (6th Cir. Jan. 5, 1993) (per curiam). As evidence of temporal overlap, Vichitvongsa suggests he and Byrd (the one who provided him information about Daniel Crowe's Smith County residence) talked the evening of the LaVergne robbery about that robbery, and then met "[t]wo or three days before" the Smith County robbery for planning purposes. That they communicated after one robbery, and before the next, does not, without more, establish any temporal overlap between the two robberies.

*Persons.* As to the second factor, there is overlap between the conspirators in the two robberies. Some were involved in the first but not the second and vice versa, but the rest were all the same. At the same time, however, there is no evidence linking Byrd, the person responsible for providing the "lead" for the Smith County residence to the LaVergne robbery. At best, the factor slightly favors defendant.

*Offenses charged in the indictment.* The third factor weighs in defendant's favor. For each robbery, the indictment charged defendant with one count of conspiring to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951, and one count of conspiracy with intent to

distribute controlled substances in violation of 21 U.S.C. § 846. The only differences in the indictments is the place of the robbery and the kind of drugs sought.

*Nature of the activity.* The fourth and most significant factor weighs heavily in the government's favor. There is evidence of some similarity between the robberies: each targeted money and drugs, and each were extremely violent, resulting in property damage and personal injury. However, there is no evidence weaving the two together into a single, overarching plan to target money and drugs, or to use violence to accomplish this goal. Rather, the evidence confirms the robberies were acts of opportunity without overarching collaboration, with different co-conspirators driving each. *See Lanier*, 623 F. App'x at 773–74.

*Location.* As for the last factor, this falls toward the government as well. Yes, they all occurred in metropolitan Nashville, but the record is devoid of any other evidence connecting these locations together other than the fact that they were "circumstantial opportunit[ies]" near the co-conspirators' residences. *Id.* at 774.

In sum, three of the five factors—including the most significant factor, the nature of the co-conspirators' actions—militate against finding an overarching conspiracy. *See Sinito,* 723 F.2d at 1256–57 ("Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses."). Therefore, and upon evaluating the totality of the circumstances, the district court did not clearly err in finding that a preponderance of the evidence supported the conclusion that the conspiracies to commit the two robberies were separate conspiracies. Defendant's double jeopardy claim lacks merit.

V.

Vichitvongsa's final claim of error in Case No. 15-5037 is that the district court's sentence is substantively unreasonable. His counsel conceded at oral argument that if we agreed with his position as to the multiple § 924(c) convictions, defendant's sentence is reasonable. This concession resolves this issue.

VI.

*Case Number 14-6013*

On August 10, 2011, Metro Nashville Police Department Officer Jerre Fly observed defendant driving a car without a seat belt and initiated a traffic stop. The car was registered to Byrd, the car's other passenger (and the same individual who tipped defendant off about the Smith County robbery). As Fly approached the car, he "observed in plain view a handgun that was sticking . . . out approximately three-fourths of the way from under the driver's seat." "The barrel was facing towards the front, and the butt of the gun was facing towards the left back seat passenger door." Officers eventually recovered a loaded Smith & Wesson nine-millimeter semiautomatic handgun from the car. Fly never saw defendant handle the gun.

At trial, the government introduced excerpts from two recorded phone calls made from the Davidson County Correctional Center using a "PIN" number assigned to defendant to use when placing prepaid or collect phone calls. An inmate identifying himself as "Nelly" placed both calls. During the first, the inmate indicated he was charged with being a felon in possession of a gun. When asked "what gun [he] g[o]t caught with," Nelly responded, "The Smitty." On the second call, Nelly stated he was "pulled over," "they ain't let me go this time," "they caught me," and "they caught me with my burner."

Two witnesses familiar with defendant identified the voice on the recordings as Vichitvongsa's. Both testified that he went by the nickname of "Nelly." They also stated that "burner" and "Smitty" are common references to handguns, with the latter referring to a Smith & Wesson handgun.

A jury convicted Vichitvongsa of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. Following the verdict, he moved for a judgment of acquittal, arguing the government failed to prove beyond a reasonable doubt that he possessed a firearm. The district court denied this motion, and subsequently sentenced him to 63 months' imprisonment.

To convict defendant of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), the government was required to prove: (1) defendant was a convicted felon; (2) defendant possessed a firearm; and (3) the firearm traveled in or affected interstate or foreign commerce. *See United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013). Defendant only claims that the government failed to present sufficient evidence that he possessed a firearm. The standard of review for this claim is the same as for his sufficiency of the evidence challenge to his Hobbs Act convictions; we assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

The government may establish possession by actual or constructive possession of a firearm. *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). "[T]he line of demarcation between 'actual' and 'constructive' possession is not analytically crisp." *Walker*, 734 F.3d at 456. "Actual possession requires that a defendant have immediate possession or control of the firearm, whereas constructive possession exists when the defendant 'does not have possession but instead knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others.'" *Campbell*, 549 F.3d at 374 (citation omitted). "The element of possession can be proven by either direct or circumstantial evidence. Circumstantial evidence alone is sufficient to sustain a conviction." *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014) (citations omitted).

Here, and at a minimum, defendant constructively possessed a firearm. Fly observed a firearm "sticking . . . out" from under the driver's seat of the car defendant was driving. As defendant points out, "[p]resence *alone* near a gun . . . does not show the requisite knowledge, power, or intention to exercise control over the gun to prove constructive possession." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (en banc); *accord United States v. Newsom*, 452 F.3d 593, 609 (6th Cir. 2006).

"But that is not what we have here. Here we have other incriminating evidence, coupled with presence, that serves to tip the scale in favor of sufficiency." *Arnold*, 486 F.3d at 183 (alterations, citations, and brackets omitted). "Other incriminating evidence"—a "connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement

indicating involvement in an enterprise—coupled with proximity may suffice." *Campbell*, 549 F.3d at 374 (citations and internal quotation marks omitted). A defendant's statement of ownership is especially incriminating. *See, e.g.*, *Newsom*, 452 F.3d at 609–10 (statement by defendant that he "had that gun" found within an arm's reach under his seat, among others, constituted sufficient evidence of possession); *United States v. Thomas*, 497 F.2d 1149, 1150 (6th Cir. 1974) (per curiam) ("[I]t is not unreasonable to infer Thomas' possession of the gun from the fact[] that he . . . call[ed] it 'my gun.'"); *United States v. Curruthers*, 511 F. App'x 456, 460 (6th Cir. 2013) (jailhouse call by defendant stating "they found that shit in the car" rationally supported an inference that defendant possessed a firearm).

Such "other incriminating evidence" takes the form of two jailhouse phone calls, where an individual, using defendant's calling PIN number, referring to himself by one of defendant's nicknames, and identified as defendant by two witnesses familiar with his voice, stated that police "pulled [him] over" and "caught [him]" with a gun: "The Smitty" and "*my* burner." The government presented evidence that "Smitty" and "burner" are common references to handguns, and that a "Smitty" refers to a Smith & Wesson handgun—the same model gun defendant's indictment charged him with possessing. This evidence more than adequately constitutes "other incriminating evidence."

Latching onto the fact that the firearm was also in close proximity to the vehicle's other occupant (and owner), Vichitvongsa contends *United States v. Beverly*, 750 F.2d 34 (6th Cir. 1984), dictates a different result. There we found constructive possession to be lacking where police officers found the defendant and another individual close to a wastebasket containing guns, one of which had the defendant's fingerprints. *Id*. at 36–37. As an en banc court, we have subsequently distinguished Beverly as a proximity-only case without any evidence "connect[ing] the gun to the defendant." *Arnold*, 486 F.3d at 184. We filled the "evidentiary gap" in *Arnold* with statements by the victim connecting the gun to the defendant. *Id*. at 184–85. Likewise, defendant's own statements connecting him to the gun distinguish *Beverly*.

Finally, defendant argues that the phrases "Smitty" and "burner" were "insufficient proof that [he] possessed the 'relevant gun' at the 'relevant time.'" He contends, therefore, that this case is materially distinct from *Arnold* where "the witness gave a detailed description of the

weapon." Defendant's attempt to distinguish this case from *Arnold* is a curious one, as there the detailed description was that of a "black handgun" that could be "cocked" by "pull[ing] back the slide." 486 F.3d at 180. Viewing the evidence in the light most favorable to the prosecution, we had no problem concluding that *any* rational trier of fact could have found Arnold possessed a firearm due to this "eyewitness testimony describing a firearm actually possessed by the defendant that matches a firearm later recovered by the police." *Id.* at 183. Here, defendant's jailhouse statements mirror what he was alleged to have done, tracking his arrest (he was pulled over), his charge (felon in possession), and the facts supporting his charge (being caught with the Smitty). Most especially, defendant admitted to being caught with his gun, "my burner." These circumstances stand on par with the "other incriminating evidence" in *Arnold*.

In conclusion, Vichitvongsa has failed to meet the very heavy burden of showing that no rational trier of fact could have found he possessed a firearm beyond a reasonable doubt. We affirm.

## VII.

For these reasons, we affirm the district court in Case No. 14-6013. We reverse the district court in Case No. 15-5037, vacate two of defendant's § 924(c) convictions, and remand for entry of a revised judgment and sentence. We affirm in all other respects.