NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0280n.06

No. 22-3594

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jun 16, 2023 |
|  | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| DEVONTE L. FELLOWS, | ) |  |
| Defendant-Appellant. | ) | OPINION |
|  | ) |  |

Before: GILMAN, BUSH, and READLER, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Devonte Fellows sold Austin Thompson fentanyl on three separate occasions. The third transaction was the last, for afterwards Thompson died. A grand jury indicted Fellows for distributing fentanyl, in violation of 21 U.S.C. § 841(a)(1), including an enhanced death-resulting penalty provision under 21 U.S.C. § 841(b)(1)(C). After a jury found him guilty, Fellows appealed, challenging the sufficiency of the evidence, the jury instructions, and the procedural and substantive reasonableness of his sentence. Because the district court correctly denied Fellows' motion for a judgment of acquittal based on the insufficiency of the evidence and reasonably sentenced him, we AFFIRM.

**I.**

Fellows and Thompson were former high-school classmates. Their reunion through the drug trade ended in tragedy.

Text messages tell much of the story. On April 24, 2019, Fellows exchanged texts with Thompson, offering to sell him 0.4 grams of a mixture that purported to be heroin and fentanyl.

After Fellows gave Thompson his address, Thompson confirmed that he planned to leave soon to meet Fellows and make the purchase. The buy apparently proceeded as planned.

The next day, Thompson texted Fellows, asking for another 0.4 grams of the mixture. Thompson said that he could meet around 9:00 p.m. that night, which was around the time they had met the previous night. Fellows agreed. Again, the drug purchase seemed to go smoothly.

The following day, April 26, 2019, Thompson texted Fellows once again to buy more of the mixture of heroin and fentanyl. Thompson initially asked for around half a gram of the mixture—a similar quantity to his previous purchases—but Fellows suggested that Thompson instead purchase a full gram of the mixture to "save a couple trips [sic]." After some haggling over the price, Thompson texted to say that he would meet Fellows but had to stop at an ATM first. Fellows then asked Thompson to delete the text messages they had just exchanged. About an hour later, Fellows told Thompson that he was on his way to meet for the transaction. Thompson then asked if Fellows had brought a scale to weigh the drugs and said that he would be there soon.

A few hours after returning home from this third transaction, Thompson texted Fellows, asking if the mixture he just purchased was different from his earlier buys because it "[d]on't [sic] seem as strong." In response, Fellows assured Thompson it was the same mixture as before. That was their last communication.

Thompson spent his final hours with his sisters, Bailey and Morgan. At one point, they took a quick trip to a gas station and a grocery store. Thompson entered those retail establishments with Bailey while Morgan remained in the car. His sisters noticed that he was slurring his words and kept falling asleep on the way home. Once home, Thompson and Bailey began watching a

movie, but he kept falling asleep. After they stopped watching the movie, Thompson went upstairs around 9:00 p.m. An hour later, Morgan heard a loud thud from upstairs.

Around 10:30 p.m., Thompson's parents returned home, and his mother realized that he was locked in the bathroom and not answering. His father then kicked in the bathroom door to discover Thompson slumped over with a purple face. He was unresponsive and not breathing when paramedics arrived in response to a 911 call. They transported him to the hospital and administered several doses of Narcan, but it was too late. An autopsy concluded that "fentanyl [was] the cause of death." The autopsy also discovered that Thompson had atherosclerotic heart disease, some blockage of the coronary arteries, and cardiomegaly (an enlarged heart).

An investigation of Thompson's death ensued. At the scene of Thompson's overdose, Officer Ted Davis recovered Thompson's cell phone, wallet, and a white, cellophane plastic baggie with powder inside it. Davis looked around Thompson's bedroom but saw nothing significant, and Thompson's family declined consent for Davis to search the home for other evidence. DNA testing of the recovered baggie revealed only Thompson's DNA. Forensic testing determined the 0.1 gram of powder inside the baggie was a mixture of fentanyl and acetylfentanyl instead of the fentanyl-heroin mixture referenced in the texts.

And as for those texts, they were reviewed by Officer Brandon Good pursuant to a search warrant for Thompson's phone. Good also obtained Thompson's bank records, which revealed an ATM withdrawal on April 26 near Fellows' residence.

FBI Special Agent Lance Kepple, a member of the Cellular Analysis and Survey Team, analyzed the cell-tower data from Thompson's phone for the days just before his death. That information revealed that on each day of the drug transactions—April 24, 25, and 26— Thompson's cell phone traveled from Cuyahoga Falls, the town of Thompson's residence, to a

street in Cleveland near Fellows' residence before returning to Cuyahoga Falls. Those movements were consistent with the times established by the texts exchanged by Thompson and Fellows. As to April 26 in particular, Agent Kepple testified that "it's unlikely that [Thompson's] vehicle stopped anywhere during its route of travel" back to Cuyahoga Falls after stopping in Cleveland.

Officer Good also obtained a search warrant for Fellows' cell phone and then met with him. Once Fellows learned that the police had copies of the texts that he had exchanged with Thompson, he confessed to selling drugs. But as to what those drugs were, Fellows' story changed multiple times. First, he said they were Xanax tablets. But then he said cocaine. Finally, Fellows admitted to selling fentanyl, yet he claimed that he had found that drug at a friend's house and had sold it to Thompson only once.

A grand jury indicted Fellows on one count of distributing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The indictment also included an enhanced penalty provision under 21 U.S.C. § 841(b)(1)(C), because the fentanyl resulted in Thompson's death. After the government presented its case at trial, Fellows moved for a judgment of acquittal, which the district court denied. He presented no evidence of his own.

The district court then included in the jury instructions an enhanced-penalty instruction in accordance with the Sixth Circuit Pattern Criminal Jury Instructions, 2021 Edition, Section 14.02. Fellows made no objection. However, the initial transcript of the jury instruction read: "But-for causation exists where use of the controlled substance combines with other factors to produce death, and death would not have occurred 'without the incremental *evening*' of the controlled substance." R. 69, PageID 1027–28 (emphasis added). The pattern instruction notably uses the word "effect" rather than "evening," which the transcript erroneously included.

Upon realizing the mistake, the government moved to correct the record, R. 72, PageID 1036–40, and the district court fixed the typographical mistake in the transcript after confirming it had instructed the jury accurately, R. 73, PageID 1041.

The jury found Fellows guilty of distributing fentanyl and the death-resulting sentencing enhancement. R. 63, PageID 341. The presentence report (PSR) calculated a total offense level as 38, based on the sentencing enhancement, and a criminal-history category of II, which lead to a Guidelines range of 262 to 327 months of imprisonment. R. 47, PageID 217. Fellows did not object to the proposed calculation. R.64, PageID 348. After hearing statements from the victim's family and the defendant's allocution, the district court imposed a sentence of 327 months' imprisonment—the top of the Guidelines range. *Id.* at PageID 388–39. Once the district court announced the sentence, the defense had no further objections. *Id.* at PageID 389. Fellows timely appealed.

**II.**

We review de novo the district court's denial of a defendant's motion for a judgment of acquittal challenging the sufficiency of the evidence to support a criminal conviction. *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016). To address whether the evidence is sufficient, we must determine "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The government had to prove that two things occurred: "(i) knowing or intentional distribution of [a controlled substance], § 841(a)(1), and (ii) death caused by ('resulting from') the use of that drug. § 841(b)(1)(C)." *Burrage v. United States*, 571 U.S. 204, 210 (2014) (footnote omitted). By this

standard, we hold that the district court properly denied Fellows' motion for a judgment of acquittal.

As to the knowing or intentional distribution of a controlled substance, the government established that Fellows distributed the fentanyl to Thompson beyond a reasonable doubt. As the most salient proof, Fellows admitted to selling Thompson fentanyl the day he died. This admission found confirmation in the text messages arranging the drug transactions, along with the cell-phone-location data and ATM withdrawals corroborating the texts.

Fellows attempts to place blame on Thompson's friend Steven Frederick, but no evidence supported that contention. True, Officer Good found texts between Thompson and Frederick, a friend and former football teammate of Thompson. But Frederick maintains that he never met with Thompson on April 26, and Frederick's sister explained that Thompson never showed up that day to meet with Frederick. Even more pertinent, Frederick's sister told Officer Good that Frederick had not been doing drugs with Thompson "recently because [Frederick] didn't know the source of [Thompson's] drugs." And Thompson's phone gave no indication that he bought drugs from anyone other than Fellows during the decedent's last few days.

Fellows questions the credibility of various witnesses, but that is not a sufficient basis to overturn his conviction. We may not "invade the province of the jury as the sole finder of fact in a jury trial." *United States v. Graham*, 622 F.3d 445, 449 (6th Cir. 2010) (quoting *United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001)). So we may not second guess the credibility that the jury ascribed to Officer Good's or Agent Kepple's testimony, including what Good learned from Frederick or his sister.

Fellows further argues that the search of Thompson's residence could have led to additional evidence or that Thompson might have acquired the fentanyl from another drug dealer. But a reasonable jury was entitled to reject these contentions as mere speculation.

The jury also had a reasonable basis to find that Thompson's death resulted from the fentanyl Fellows distributed. To make this showing, the government had to prove that "the drug . . . [was] a but-for cause of the victim's death or injury. But-for causation exists where use of the controlled substance 'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211, 218–19).

Fellows also points to the other physical conditions of Thompson that were discovered during the autopsy as explanations for the victim's passing, Appellant's Br. at 32, but that does not undermine the autopsy's finding that Thompson's death resulted from fentanyl. R. 68, PageID 659. With 18.2 nanograms per milliliter of fentanyl present in Thompson's blood, he had a potentially fatal level of that drug in his system. *Id.* at PageID 664. And, as Dr. Lisa Kohler, Chief Medical Examiner for the Summit County Medical Examiner's Office, testified, Thompson's other physical conditions were not lethal. *Id.* at PageID 658. Accordingly, the record was sufficient for a reasonable jury to find Fellows guilty of each element underlying his conviction. *See United States v. Skouteris*, 51 F.4th 658, 670 (6th Cir. 2022).

Fellows further challenges the jury instructions. But because he did not timely object to those instructions, we review under the plain-error standard. *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006). There was no instructional error—only a typographical mistake in the transcript. R. 73, PageID 1041. The district court's actual instructions to the jury and the corrected instruction transcript strictly adhered to the Sixth Circuit Pattern Instruction 14.02, and Fellows

has not shown any other error that affected his rights or the judicial proceedings. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

Fellows rounds out his appeal with challenges to the procedural and substantive reasonableness of his sentence. We review procedural reasonableness under the plain-error standard because he did not object at sentencing, *United States v. Haj-Hamed*, 549 F.3d 1020, 1024 (6th Cir. 2008), and substantive reasonableness under the abuse-of-discretion standard, *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). None of the arguments presented by Fellows regarding the reasonableness of his sentence are persuasive.

A sentence is procedurally unreasonable, in relevant part, if the district court miscalculates the Guidelines range, treats the Guidelines range as mandatory, or fails to explain its sentence adequately. *United States v. Peebles*, 624 F.3d 344, 347 (6th Cir. 2010). The district court properly calculated the Guidelines range based on the death-resulting enhancement, and Fellows did not object to the calculations during sentencing. So absent "exceptional circumstances," the procedural reasonableness of the imposed sentence will stand. *Vonner*, 516 F.3d at 386. Fellows claims that the district court should have considered the Guidelines range without the sentencing enhancement because he lacked the intent to harm Thompson. Appellant's Br. at 36. That argument is unavailing, however. The death-resulting sentencing enhancement applies because he was convicted under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and there is no requirement that the defendant had the specific intent for the victim to die, U.S.S.G. § 2D1.1(a)(2).

Finally, regarding substantive reasonableness, a within-Guidelines range is presumed reasonable, and Fellows' sentence, while at the top of the range, is within the Guidelines. *See United States v. Elmore*, 743 F.3d 1068, 1072 (6th Cir. 2010) (citing *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010)). The district court considered and weighed the § 3553(a)

factors when sentencing Fellows, including: personal history and characteristics, the nature and circumstances of the offense, and the need to protect the public. 18 U.S.C. § 3553(a); R. 64, PageID 350. The district court particularly focused on the need to protect the public and to deter Fellows because he was arrested while in possession of 371 Xanax tablets only a few days after Thompson died. *Id.* at PageID 385–86. And while the imposed sentence is higher than the sentence offered by the government while negotiating a potential plea deal, the district court was not bound by that unaccepted offer. *See United States v. Brown*, No. 21-3243, 2022 WL 247737, at *3 (6th Cir. Jan. 27, 2022).

## III.

For the foregoing reasons, we AFFIRM.