NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0344n.06

Case No. 22-5599

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 02, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| MAHLON PRATER, JR., | ) | |
|     Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; GRIFFIN and READLER, Circuit Judges.

SUTTON, C.J., delivered the opinion of the court in which READLER, J., joined. GRIFFIN, J. (pp. 13–29) delivered a separate dissenting opinion.

SUTTON, Chief Judge. The government charged Mahlon Prater with joining two conspiracies. One involved an agreement focused on selling methamphetamine, heroin, and oxycodone on behalf of the Vice Lords. It was centered in Knoxville, Tennessee, though its reach extended to California. The other conspiracy involved an agreement to sell crack cocaine with low-level crack dealers in the Knoxville area. A grand jury indicted Prater for his involvement in both conspiracies. He pleaded guilty to the smaller conspiracy involving crack cocaine, and he went to trial on the larger conspiracy involving the Vice Lords and the other drugs. A jury found him guilty of the second conspiracy. He argues that the two conspiracies were one and the same and that his prosecution for both violates the Fifth Amendment's Double Jeopardy Clause. We disagree, and we also reject his alternative challenges to his conviction and sentence.

I.

In 2018, law enforcement officers uncovered a large drug-trafficking conspiracy involving the Vice Lords in Knoxville, Tennessee. The investigation homed in on a dozen gang members, including Prater, who made "bread" (money) by selling "ice cream" (methamphetamine), "blues" (oxycodone), fentanyl, and "boy" (heroin). R.541 at 8–9. Between June and August 2019, FBI wiretaps recorded conversations about the group's drug transactions and use of guns. Officers also intercepted a package containing five pounds of pure methamphetamine that the Vice Lords had mailed from California to Prater's Tennessee home. Based on these developments, a grand jury indicted six of the Vice Lords for a drug-trafficking conspiracy on September 4, 2019, and later indicted them for a money laundering conspiracy and related firearm offenses.

That same day, the grand jury indicted Prater for a separate agreement to sell crack cocaine. It charged him with efforts to "combine, conspire, confederate, and agree with each other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute, and to possess with intent to distribute, a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance." R.1 at 1 (No. 152); *see* 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C). Prater pleaded guilty to this conspiracy charge. His plea agreement stipulated that, between December 2018 and April 2019, he "worked with others to sell crack cocaine" "to a confidential source" "[o]n at least 6 separate occasions." R.15 at 2 (No. 152). The government described his coconspirators as "a limited number of lower-level east Knoxville crack dealers." R.231 at 51. The specified drug weight, approximately 30 grams, amounted to between 60 and 300 doses.

After Prater's plea but before his sentencing, a superseding indictment in the Vice Lords case added him to the conspiracy, charging him with agreeing to possess and distribute "fifty (50) grams or more of methamphetamine," "a quantity of . . . fentanyl," "a quantity of . . . oxycodone,"

"a quantity of . . . alprazolam," "a quantity of . . . marijuana," "a quantity of . . . buprenorphine," and "a quantity of . . . heroin" between July 2018 and November 2019. R.78 at 1–2; *see* 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), (b)(1)(C), (b)(1)(D), (b)(1)(E), (b)(2). The five pounds of methamphetamine alone totaled between 9,000 and 22,000 doses. *Cf. United States v. Potter*, 927 F.3d 446, 448 (6th Cir. 2019). A second superseding indictment charged Prater with two more methamphetamine offenses plus possession of a firearm in aid of selling the drugs. *See* 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A); 18 U.S.C. §§ 924(c)(1)(A)(i), 2.

Prater moved to dismiss the second superseding indictment on double jeopardy grounds. The district court denied the motion, concluding that the conspiracies were "separate and distinct offenses." R.322 at 12.

At trial, Christopher Hounschell, a Vice Lord who sold crack cocaine outside of the agreement to sell the other drugs, testified that Prater also dealt cocaine. Hounschell said that he had no knowledge of Prater selling crack cocaine with the Vice Lords and stated that he had not "heard anybody else [in the conspiracy] talking about that." R.537-2 at 128. He confirmed that he knew of no "Vice Lords [] selling crack cocaine as part of this conspiracy" and that crack cocaine was not among the gang's "predominant[]" drugs. *Id.* at 125, 127.

A jury found Prater guilty on four counts. Prater twice renewed his double jeopardy motion, first at the close of the government's case and then at the end of the trial. He argued that Hounschell's testimony established that the Vice Lords conspiracy involved crack cocaine. The district court denied the motion, finding that Hounschell's testimony had the opposite effect. It showed that the two conspiracies were distinct and focused on different drugs.

The district court sentenced him to 384 months for the Vice Lords conspiracy. It set that sentence to run concurrently with his sentence of 240 months for the crack cocaine conspiracy. Prater appealed.

II.

The first issue is whether Prater's conviction for his participation in the Vice Lords conspiracy violates his rights under the Fifth Amendment's Double Jeopardy Clause.

Our standard of review usually turns on whether the district court engaged in fact finding. If so, clear-error review applies. *In re Grand Jury Proc.*, 797 F.2d 1377, 1380–81 (6th Cir. 1986). If not, fresh review applies. *See United States v. Meda*, 812 F.3d 502, 508–10 (6th Cir. 2015). Because the district court concluded that "the Government's proffered evidence preponderates in favor of the existence of two conspiracies" based on fact finding, clear error review is the natural choice. R.322 at 11; *see In re Grand Jury Proc.*, 797 F.2d at 1380–81 ("The finding of fact by the lower court that the government had proven by a preponderance of the evidence that multiple conspiracies existed can be set aside only if it is clearly erroneous."). But in this instance, the outcome of the parties' debate makes no difference. Whether deferential or fresh review applies, no Fifth Amendment violation occurred.

The Double Jeopardy Clause guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. In the context of successive conspiracy indictments, we gauge whether the indictments charge the "same offense" based on five potential sources of overlap: (1) time; (2) coconspirators; (3) charges in the indictment; (4) overt acts and the nature of the conspiracy; and (5) place. *Meda*, 812 F.3d at 508; *see United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). If at least a few factors differ between the conspiracies, it usually "follows that the alleged illegal conspiracies are separate and

4

distinct offenses." *Meda*, 812 F.3d at 508 (quoting *Sinito*, 723 F.2d at 1256–57). In this instance, the many differences between the two conspiracies favor the district court's decision to treat them as separate.

Take time. Prater's two conspiracies covered materially distinct time periods. The crack cocaine conspiracy ran from just December 2018 to April 2019, while the Vice Lords conspiracy ran from July 2018 to November 2019. The four-month crack cocaine conspiracy covered "a significantly shorter duration" than the sixteen-month conspiracy. *United States v. Wheeler*, 535 F.3d 446, 457 (6th Cir. 2008). Four months of overlap does not imply a single conspiracy, and neither does the reality that one time period is subsumed within a much larger one. *See Sinito*, 723 F.2d at 1257; *see also United States v. Inmon*, 594 F.2d 352, 354 (3d Cir. 1979) (holding that multiple conspiracies existed when the time period in one indictment completely subsumed the time period in the second).

Turn to the coconspirators. The indictment for the crack cocaine conspiracy listed Prater and unnamed others, later described as "a limited number of lower-level east Knoxville crack dealers." R.231 at 51. The indictment in the Vice Lords conspiracy named eleven coconspirators, all enmeshed in large-scale drug dealing that focused on drugs other than crack cocaine. Prater was the only individual named in both conspiracies. These differences also favor the district court's conclusion that two conspiracies existed. *See Wheeler*, 535 F.3d at 457; *United States v. Toaz*, 59 F. App'x 94, 101 (6th Cir. 2003) (holding that this factor favored the government because the defendant was "the only conspirator . . . mentioned in both indictments").

Turn to the charges in the indictment. Both indictments charged Prater with conspiracy to distribute controlled substances, and both indictments involved the same statutory provisions: 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (conspiracy to possess with intent to distribute a

controlled substance). In addition, the Vice Lords conspiracy turned on violations of several other statutes: 18 U.S.C. § 1956(h) (money laundering conspiracy); 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (possession of a firearm in furtherance of drug trafficking); and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm). Our cases seem to assume that this factor turns solely on an overlap in statutes, as opposed to an overlap in shared goals of an agreement. *See, e.g.*, *In re Grand Jury Proc.*, 797 F.2d at 1382; *Wheeler*, 535 F.3d at 456. Other courts look at the shared goals (or not) of the agreement. *See, e.g.*, *United States v. Reyes-Correa,* 971 F.3d 6, 12–13 (1st Cir. 2020); *United States v. Leal*, 921 F.3d 951, 960 (10th Cir. 2019). Under our precedents, the reality that the two indictments share a statutory offense favors Prater. But even then, it "is a minor point, since one can certainly enter two conspiracies to commit the same type of crime." *Wheeler*, 535 F.3d at 456 (quotation omitted); *see Meda*, 812 F.3d at 509–10 (holding that a combination of time, coconspirators, and overt acts showed that there were two conspiracies, even if the charges and geography were the same).

Turn to the overt acts and the nature of the conspiracy, often called the "most significant" factor. *United States v. Vichitvongsa*, 819 F.3d 260, 274 (6th Cir. 2016); *United States v. Kennedy*, 743 F. App'x 649, 653 (6th Cir. 2018) (quoting *Wheeler*, 535 F.3d at 450). Prater's crack cocaine conspiracy involved the distribution of a relatively small amount of crack cocaine—just 60 to 300 doses. *See* U.S. Sent'g Comm'n, Cocaine and Federal Sentencing Policy 17 (2002). His role with the Vice Lords, by contrast, effected the distribution of 50 grams or more of methamphetamine plus oxycodone, alprazolam, marijuana, buprenorphine, and heroin. The five-pound shipment to his house supplied 9,000 to 22,000 doses of just one of the distributed drugs: methamphetamine. *See Potter*, 927 F.3d at 448. Because the Vice Lords conspiracy was "far more expansive in scope" and focused on different drugs (methamphetamine in particular), *Kennedy*, 743 F. App'x at 653,

6

and the smaller conspiracy focused on another drug (crack cocaine), the two conspiracies differed on this "significant" metric.

Finish with place. The Vice Lords conspiracy covered a lot of territory—Tennessee to California. Recall that the Vice Lords mailed pounds of methamphetamine from the Golden State to Prater's Knoxville house on at least three occasions. While the Vice Lords conspiracy operations crossed the continent, Prater confined his crack cocaine conspiracy to east Knoxville.

All in all, four of the five factors—time, coconspirators, overt acts, geography—show that there were two conspiracies. That suffices to uphold the district court's ruling.

*United States v. Wheeler* reinforces this conclusion. In that case from our Court, the government charged a defendant with drug-trafficking conspiracies under the same statutes invoked in Prater's two conspiracies. 535 F.3d at 456 (citing 21 U.S.C. §§ 846, 841(a)). On fresh review, we found two distinct conspiracies. *Id.* at 449, 456–57. Even though they overlapped in time, they covered distinct lengths of time. *Id.* at 456. Even though the defendant appeared in both conspiracies, the first indictment listed three coconspirators, the second indictment named thirty-four coconspirators, and only the defendant appeared in both. *Id.* The "most significant factor"— "the scope and nature of the conduct charged in each count"—diverged as well. *Id.* at 456–57. The first conspiracy featured only cocaine and methamphetamine while the second also had LSD, marijuana, ecstasy, and valium. *Id.* at 457. The first conspiracy took place mainly in Florida and Michigan while the second one covered Florida, Michigan, Ohio, Kentucky, and Indiana. *Id.* at 456. These differences in time, coconspirators, drugs, and place led us to conclude that no double jeopardy violation occurred. *See id.* at 456–57.

In some ways, this case is just like *Wheeler*, and in other ways, it is easier than *Wheeler*. As in *Wheeler*, Prater's crack cocaine conspiracy, lasting a mere four months, was materially

7

shorter than the Vice Lords conspiracy. Prater's crack cocaine coconspirators were "limited in number" and were "lower-level" crack dealers in contrast to the many leading Vice Lords members implicated in the second conspiracy. And Prater was the one common denominator in the two conspiracies' memberships.

This case is easier than *Wheeler* in other ways. The amounts of crack cocaine in the smaller conspiracy pale in comparison to the large amounts of methamphetamine and other drugs in the Vice Lords conspiracy. That thousands-of-doses difference does not appear in *Wheeler*. That the Vice Lords did not conspire to sell the drug featured in the low-level conspiracy (cocaine) also differs from *Wheeler*, where cocaine featured in both conspiracies. *Wheeler*, moreover, involved two multistate conspiracies. Here, only one conspiracy spanned multiple states, while the other involved only overt acts in Knoxville.

Prater objects to this conclusion on several grounds. He contends that the trial court failed to recognize that the government bore the burden of proof to show by a preponderance of the evidence that the crack cocaine conspiracy was not a subset of the Vice Lords conspiracy. But the district court acknowledged the point and said the government had met its burden. The "Government's proffered evidence," it reasoned, "preponderates in favor of the existence of two conspiracies." R.322 at 11. Any doubt about the point is alleviated by the court's decision to deny Prater's double jeopardy motion at the end of his trial based in part on the evidence introduced at trial.

Prater separately insists that the conspiracies were the same because the sixteen-month Vice Lords conspiracy enveloped the four-month crack cocaine conspiracy. That is true, but it is not dispositive. "Overlap in time alone is not conclusive evidence of a single conspiracy." *Vichitvongsa*, 819 F.3d at 273 (quotation omitted). "An overlap of ten months is not indicative of

8

one conspiracy," a reality that remains true even when one indictment's time period "completely subsumed" the other. *Sinito*, 723 F.2d at 1257 (citing *Inmon*, 594 F.2d at 354).

Prater claims that his crack coconspirators must be Vice Lords because the government did not identify them. That's not what the record before us shows. Hounschell, another Vice Lord who himself dealt crack, was unaware of *any* Vice Lords selling crack cocaine *for* that conspiracy. As the government explained, Prater's crack cocaine operation relied on "lower-level" crack dealers. *Cf. United States v. Stapleton*, 39 F.4th 1320, 1330 (11th Cir. 2022) ("A conspiracy indictment . . . may properly refer to unidentified co-conspirators." (quotation omitted)).

Prater argues that Hounschell's statement that crack cocaine was not a "predominant" drug of the Vice Lords implies that the Vice Lords still dealt some amount of crack. But there is no evidence that the Vice Lords integrated this controlled substance into their business model, as opposed to permitting members to sell it on their own. Recall that Hounschell testified that he had no knowledge of Prater selling *crack* cocaine *with* the Vice Lords, said that he had not "heard anybody else [in the conspiracy] talking about that," and confirmed that he knew no "Vice Lords [] selling crack cocaine as part of this conspiracy." R.537-2 at 125, 127–28. But even if that were not the case, Prater would face another problem. The same was true in *Wheeler*. It involved overlapping drugs, and we nonetheless found two conspiracies. That's because there, as here, the number and volume of substances revealed multiple conspiracies. *See Wheeler*, 535 F.3d at 456–57; *see also Toaz*, 59 F. App'x at 102 (concluding that while both indictments "charge [the defendant] with conspiracy to distribute and possess with intent to distribute methamphetamine, the similarities between the two conspiracies end there").

Prater argues that one of the factors (place) leans in his favor because the Vice Lords operated in Knoxville, where he sold crack cocaine. This argument overlooks the thousands of

methamphetamine doses shipped to Prater's home from California. That both conspiracies overlapped in part in the same area "is of minimum significance." *Sinito*, 723 F.2d at 1258–59. Even within the same city, the existence of similar criminal schemes is not dispositive. *Vichitvongsa*, 819 F.3d at 274 (holding that this factor favored the government even when both conspiracies occurred in Nashville); *see Inmon*, 594 F.2d at 354. Each metropolitan area in this country may well have more than one drug distributor involved in more than one drug distribution conspiracy—and, sad to say, they may have lots more. The government is permitted to target each conspiracy, as it permissibly did here and as the district court correctly concluded it did here.

## III.

That leaves just a few loose ends. Prater raises three additional challenges—one to the sufficiency of his conviction and two to the reasonableness of his sentence.

## A.

Prater claims that the evidence fails to show that he possessed a firearm (or aided and abetted his codefendants' possession of a firearm) to further the Vice Lords conspiracy. This sufficiency claim requires us to examine "the evidence in the light most favorable to the prosecution," asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The indictment charged Prater with one count of aiding and abetting the knowing possession of a firearm "in furtherance of" a drug trafficking crime. 18 U.S.C. §§ 924(c)(1)(A), 2. A defendant commits a § 924(c) offense when he knowingly possesses a firearm "to aid drug trafficking." *United States v. Maya*, 966 F.3d 493, 500 (6th Cir. 2020). And a defendant aids and abets that crime "when he knows that one of his confederates will carry a gun." *Rosemond v. United States*, 572 U.S. 65, 77 (2014).

10

Ample evidence supported Prater's conviction. A codefendant testified that Prater and two other codefendants carried guns "[a]t all times" during the summer of 2019—the middle of the Vice Lords conspiracy. R.537 at 54–55. And Hounschell testified that three codefendants regularly carried guns for protection while dealing drugs. These facts adequately support the jury's finding that Prater knew that his codefendants carried guns during this period of drug trafficking. Because Prater aided and abetted his codefendants' crimes, we need not consider whether Prater also violated § 924(c) by personally using a firearm while drug dealing.

B.

Prater separately challenges his sentence by arguing that the district court miscalculated his guidelines range by applying an obstruction enhancement and denying an acceptance of responsibility reduction. *See Gall v. United States*, 552 U.S. 38, 50–51 (2007). We review the district court's fact findings for clear error. *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). This court has not settled on the proper standard of review for a district court's application of its factual findings to either guideline provision. *See id.* at 608–12. We need not resolve that issue in this case because Prater's challenges fail even under fresh review.

*Obstruction of justice.* Prater first contests the district court's two-level sentence enhancement for willful obstruction of justice. *See* U.S.S.G. § 3C1.1. A court must impose this enhancement if a defendant threatens a witness to deter his cooperation with the government. *United States v. Hurst*, 228 F.3d 751, 761–62 (6th Cir. 2000).

Codefendant Seth Curtis testified that Prater and another codefendant, Trevor Cox, demanded that Curtis either pay them or recant his guilty plea. When Curtis refused, Cox "pulled a shank" on him, and Prater threw Curtis's sleeping mat to the door, perhaps to intimidate him. R.903 at 21. These facts show that Prater obstructed justice by trying to coerce Curtis to withdraw

his guilty plea.

*Acceptance of responsibility.* Prater next claims that the district court should have granted him a reduction for his acceptance of responsibility. To receive the guidelines reduction, a defendant must "clearly demonstrate[]" his acceptance of responsibility—a showing that is almost always inconsistent with proceeding to trial and obstructing justice. U.S.S.G. § 3E1.1(a) & cmt. nn.2, 4; *see United States v. Trevino*, 7 F.4th 414, 431–32 (6th Cir. 2021); *Thomas*, 933 F.3d at 612. Prater contested his guilt for the Vice Lords conspiracy at trial and continues to do so on appeal. And the district court found that he obstructed justice by threatening a codefendant. So the district court rightly rejected Prater's request for the reduction.

Prater contends that the reduction should apply because he took responsibility for the crack cocaine conspiracy and only proceeded to trial to advance his double jeopardy arguments. Both points fail. Prater "must accept responsibility for all counts before he is entitled to a reduction." *Trevino*, 7 F.4th at 432 (quotation omitted). Prater's actions during the crack cocaine conspiracy proceedings do not excuse his choices during the Vice Lords conspiracy proceedings. And a reduction is inappropriate if a "defendant contests even one factual element of the offense." *Id.* Prater could have preserved his rights before trial by appealing the pretrial order rejecting his double jeopardy challenge. *Abney v. United States*, 431 U.S. 651, 662 (1977). Instead, Prater proceeded to trial and denied an essential factual element of guilt: that he knew his codefendants possessed firearms. Prater's obstruction of justice and his choice to challenge the charges' factual bases preclude application of this reduction even under fresh review.

We affirm.

GRIFFIN, Circuit Judge, dissenting.

Law enforcement officials learned of defendant Mahlon Prater's drug-trafficking activities through their investigation into a chapter of the Vice Lords street gang operating in Knoxville, Tennessee. That investigation first resulted in two conspiracy indictments issued on the same day—one for Prater for trafficking crack cocaine, and another for other Vice Lords for trafficking methamphetamine. Prater pleaded guilty to the cocaine-trafficking charge, but he was later indicted on and found guilty of—along with many other Vice Lords—conspiring to traffic methamphetamine and several other controlled substances (but not crack cocaine), as well as other drug-trafficking-related crimes.

In my view, Prater's subsequent prosecution violates his rights against double jeopardy. Therefore, I would vacate Prater's convictions for Count One (conspiracy to distribute various controlled substances) and for Count Two (aiding and abetting the possession of firearms to further the drug-trafficking conspiracy) and remand for plenary resentencing. Because the majority opinion holds to the contrary, I respectfully dissent.

I.

As part of its investigation into the Vice Lords' drug-trafficking efforts, the government used a confidential informant to make several controlled purchases of crack cocaine from Prater in December 2018 and January 2019. Law enforcement officers eventually obtained wiretaps for three cell phones (including Prater's), and they ultimately uncovered significant evidence of a widespread drug-trafficking conspiracy centered in Knoxville, Tennessee, headed by two brothers, Alim and Ronald Turner. Our separate opinion—which addresses the appeals by Prater's co-defendants, *see* Nos. 22-5046, 22-5107, 22-5131, 22-5681, and 22-6056 (appeals of Alim Turner,

13

Ronald Turner, Kedaris Gilmore, Ushery Stewart, and Demetrius Bibbs)—sets forth further detail on the scope of the government's investigation and the Vice Lords' drug-trafficking activities.

On September 4, 2019, a grand jury returned two indictments. It first indicted several Vice Lords members—but not Prater—for conspiring to distribute methamphetamine. That case is referred to as Case No. 151, which is the case underlying this appeal. The grand jury separately indicted Prater on a single count of conspiring with "persons known and unknown to the Grand Jury" to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, referred to as Case No. 152. That indictment named none of Prater's alleged co-conspirators. It alleged that the conspiracy began "at least as early as in or around December of 2018, continuing through in and around April of 2019."

Prater pleaded guilty to the charge in Case No. 152. The factual basis for the plea agreement provided that "[w]ithin the charged conspiracy dates, the defendant worked with others to sell crack cocaine." Specifically, Prater sold the substance to a confidential informant six times, totaling about 30 grams of crack cocaine.

Before Prater was sentenced in Case No. 152, the government filed a superseding indictment in Case No. 151. That filing upgraded the drug-conspiracy count to allege a multi-drug conspiracy and included Prater as a co-defendant, along with several other Vice Lords. Eventually, the government obtained a second superseding indictment, which charged Prater with additional crimes.

Two crimes in the Case No. 151 superseding indictment are important for our purposes. Count One added Prater to the drug-trafficking conspiracy, alleging that he conspired to distribute controlled substances, including methamphetamine, fentanyl, oxycodone, alprazolam, marijuana, buprenorphine, and heroin, in violation of 21 U.S.C. §§ 841, 846. This conspiracy was alleged to

14

have occurred "in the Eastern District of Tennessee and elsewhere" "on or about July 15, 2018 through on or about November 22, 2019" and to have involved "other persons known and unknown to the Grand Jury." Count Two is predicated on Count One. It alleged that during the same time, Prater aided and abetted the possession of firearms in furtherance of a drug-trafficking crime (the drug-trafficking conspiracy), in violation of 18 U.S.C. § 924(c)(1)(A).

Prater moved to dismiss the superseding indictment, asserting the Double Jeopardy Clause prohibited his prosecution in Case No. 151 given his guilty plea in Case No. 152. The government opposed, arguing that Case No. 152 involved a smaller conspiracy between Prater and other crack-cocaine dealers separate from the larger Vice Lords conspiracy. A magistrate judge agreed with the government, issuing a report and recommendation denying Prater's motion to dismiss. On Prater's objections, the district court issued an opinion and order that "agree[d] with and incorporate[d]" the magistrate judge's analysis and denied Prater's motion to dismiss. Prater again objected on double-jeopardy grounds through a Rule 29 motion for a new trial, which the district court denied. He now appeals.

## II.

The Constitution's Double Jeopardy Clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. As the Supreme Court long ago recognized, "[i]f there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence." *Ex parte Lange*, 85 U.S. 163, 168 (1873). Accordingly, the Double Jeopardy Clause "protects against a second prosecution for the same offense after conviction or acquittal." *United States v. Turner*, 324 F.3d 456, 461 (6th Cir. 2003) (citation omitted).

15

Courts typically evaluate double-jeopardy claims using the "same evidence" test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See, e.g.*, *United States v. Garner*, 529 F.2d 962, 971 (6th Cir. 1976). But we use a different method to evaluate claims of double jeopardy for conspiracies given their unique nature. In conspiracy cases, like this one, "it is the agreement which forms the nucleus of the offense." *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). "A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce*, 488 U.S. 563, 570–71 (1989).

"[T]he multiple/single conspiracy issue is determined by applying a 'totality of the circumstances' test rather than the more limited 'same evidence' test normally applied to double jeopardy reviews of substantive offenses," *In re Grand Jury Proc.*, 797 F.2d 1377, 1380 (6th Cir. 1986) (citations omitted), due to "the inherent infirmities in applying the same evidence test to conspiracy cases," *Sinito*, 723 F.2d at 1256. "An overzealous prosecutor," we explained in *Sinito*, could "circumvent a charge of double jeopardy" by "carving up one conspiracy into two or even more," charging "certain overt acts in one indictment and a different set of overt acts in" another. *Id.* To mitigate that risk, we instead apply a totality-of-the-circumstances, five-factor balancing test. Under *Sinito*, courts must weigh: "1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place." *Id.* The "ultimate question" this test is designed to answer "is whether the evidence shows one agreement or more than one agreement." *In re Grand Jury Proc.*, 797 F.2d at 1380.

16

This test requires application of a burden-shifting paradigm. The defendant must first establish a "non-frivolous or prima facie showing of a single conspiracy." *Id.* It then becomes the government's burden "to show separate conspiracies by a preponderance of the evidence." *Id.* We generally review for clear error a district court's finding that the government showed separate conspiracies by a preponderance of the evidence when the district court engages in factfinding and when it applies the correct burden of proof. *Id.* at 1380–81. But when the district court fails to do so and merely compares the language in the indictments, we review de novo. *See, e.g.*, *United States v. Wheeler*, 535 F.3d 446, 449, 455 (6th Cir. 2008); *United States v. DeCarlo*, 434 F.3d 447, 452, 454–57 (6th Cir. 2006).

The district court here neither considered our burden-shifting test nor engaged in factfinding when it reviewed Prater's motions to dismiss the indictment. Instead, when it rejected Prater's initial motion to dismiss before trial, it relied on a magistrate judge's comparison of the indictments to evaluate the *Sinito* factors, a purely legal exercise. At the motion hearing, the magistrate judge did not take any evidence warranting deference to factual findings; instead, it heard only argument from counsel. Its report and recommendation did not mention which party bore the burden of proof. Most worrisomely, at times, the magistrate judge's opinion seemed to have improperly kept the burden of proof on Prater. *See United States v. Prater*, 2020 WL 8484944, at *4 (E.D. Tenn. Dec. 21, 2020) ("Defendant fails to point to any additional evidence supporting his claim that the two charged conspiracies involve the same co-conspirators."). *But see id.* at *6 ("[T]he Court finds that the Government's proffered evidence preponderates in favor of the existence of two conspiracies."). There being no reason to defer to the district court's erroneous application of law, I would therefore "determine, *de novo*, whether the preponderance of the evidence points to two conspiracies or only one." *United States v. Sertich*, 95 F.3d 520, 524

17

(7th Cir. 1996); *cf. In re Grand Jury Proc.*, 797 F.2d at 1380–81 ("The finding of fact by the lower court *that the government had proven by a preponderance of the evidence* that multiple conspiracies existed can be set aside only if it is clearly erroneous." (emphasis added)).

As for the district court's later denial of Prater's renewed double-jeopardy motion after trial, the district court made no further factual findings there warranting deference. To the extent that the district court made a factual finding that separate conspiracies existed (as part of its denial of Prater's motion for a judgment of acquittal under Rule 29) because Christopher Hounschell testified that "he did not know defendant, or any other Vice Lords to be selling crack cocaine as part of the instant drug conspiracy," such a finding is clearly erroneous. *In re Grand Jury Proc.*, 797 F.2d at 1380–81. As set forth below, Hounschell admitted that he sold crack cocaine as part of the conspiracy indicted in Case No. 151.

### III.

According to Prater, all five *Sinito* factors weigh in his favor, establishing that the crack-cocaine conspiracy for which he was indicted, and to which he pleaded guilty in Case No. 152, was a mere slice of the larger, multi-drug conspiracy for which he was later indicted, tried, and convicted in Case No. 151. I agree. Prater made out (which neither the government nor the majority opinion dispute) a "non-frivolous or prima facie showing of a single conspiracy." *In re Grand Jury Proc.*, 797 F.2d at 1380. The government thus bears the burden of proving that these factors favor separate conspiracies by a preponderance of the evidence. *Id.* It has not sustained its burden.

*Time*. This factor favors Prater, which the government concedes and yet the majority opinion finds to the contrary.

If one charged conspiracy overlaps significantly in time with another charged conspiracy, this factor favors finding a single conspiracy. *See id.* at 1382; *see also United States v. Kistner*, 590 F. App'x 514, 517 (6th Cir. 2014) (observing that a months-long overlap between conspiracies weighed in favor of finding a single conspiracy); *United States v. Rabhan*, 628 F.3d 200, 205 (5th Cir. 2010) ("An overlap in time periods between two alleged conspiracies favors a finding of a single conspiracy, especially when that overlap is substantial."). There is more than just overlap here: the time period for the Case No. 151 conspiracy (July 15, 2018–November 22, 2019) eclipses the time period for the Case No. 152 conspiracy (December 2018–April 2019). When the time period of the larger conspiracy "completely embrace[s] the time period covered" by the smaller one, this factor favors a single conspiracy. *United States v. Jones*, 858 F.3d 221, 227 (4th Cir. 2017) (citation omitted). The umbra here is significant, with just a few months—and not years like the cases the majority opinion relies on—outside of the overlap on either side. *See*, *e.g.*, *United States v. Wheeler*, 535 F.3d 446, 457 (6th Cir. 2008) (two conspiracies, one from 1990 to 1997, and the other from 1990 to 2003); *Sinito*, 723 F.2d at 1257 (two conspiracies, one from March 1974 to January 1979, and the other from March 1978 to October 1982).[1] Because the larger conspiracy charge subsumes the smaller, this factor suggests that the government carved the smaller charge out of a single, larger conspiracy.

*Same/Different Co-Conspirators*. This factor favors Prater.

"Under this factor, the relevant question is not whether the same persons were actually charged in each indictment, but rather whether the same persons were involved in the activities

---

[1] True, *United States v. Inmon*, 594 F.2d 352, 354 (3d. Cir. 1979), had a similar eclipse, but I do not read that case as universally supporting the government's position here. Although *Inmon* observed that "[t]ime frames and personnel can overlap in separate criminal agreements," it made clear that its analysis turned not on time, but rather on there being a "clear . . . difference between the two conspiracies with respect to the key factor of suppliers." *Id.* at 354.

charged under each indictment, unindicted persons included." *United States v. Meda*, 812 F.3d 502, 509 (6th Cir. 2015).

The Case No. 152 indictment names no other alleged co-conspirators—it states only that Prater conspired with individuals "known and unknown to the Grand Jury." At oral argument, the government admitted that it still does not know who the other co-conspirators were in Case No. 152. The government never proved that Prater's co-conspirators were anyone other than Prater's fellow Vice Lords, many of whom were ultimately indicted in Case No. 151. That Prater is the only named conspirator in the Case No. 152 indictment establishes only that the government chose to draft that indictment narrowly and says nothing about whether the co-conspirators in fact differed between the conspiracies. Moreover, though the government argues that "Prater worked with a couple low level East Knoxville crack dealers to distribute to [the confidential informant]," it offered no evidence about who these "low level" dealers were. And one thing is certain—they could not have been the people to whom Prater sold the drugs because a mere buy-sell relationship does not demonstrate a conspiracy. *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009).

The evidence suggests that Prater's co-conspirators were, in fact, his fellow Vice Lords. Indeed, it was law enforcement officers' "belief that they were investigating one massive conspiracy." *Sinito*, 723 F.2d at 1258. Although "not controlling," their opinions are part of the "totality of evidence" and are "entitled to consideration." *Id.* The wiretap affidavits confirm that federal law enforcement officers thought that Prater's crack-cocaine sales were part of the larger conspiracy involving other Vice Lords. The affidavits use the term "DTO" to refer to the "drug-trafficking organization" that the officers' overall investigation targeted. That DTO encompassed all the co-conspirators from the larger No. 151 conspiracy. The affidavits state that Prater "conduct[ed] crack cocaine transactions and business associated with the DTO"; that the

20

confidential informant made "controlled buys of crack cocaine from a single member of the DTO";

that the controlled buys of crack cocaine from Prater revealed a "slice of the DTO's operations";

that distribution of "crack cocaine" was one of the offenses the Vice Lords investigation was

targeting; and that several other Vice Lords were known distributors of "crack cocaine," including

defendant Kedaris Gilmore, Kevin Roberts, Jeremiah Moore, Jaylen Cody and, perhaps most

importantly, the conspiracy's leader, defendant Alim Turner.

Christopher Hounschell—a fellow member of the Vice Lords conspiracy—also sold crack

cocaine "in addition to the other drugs that [he was] dealing with as part of this conspiracy."

Hounschell testified that Gilmore sold "anything he could get his hands on." Put differently, crack

cocaine was not the "predominant[]" trafficked drug by the Vice Lords like methamphetamine, but

it was one of the many controlled substances they acquired and sold.

The majority opinion ignores altogether that other Vice Lords sold crack cocaine, electing

instead to weigh this factor against Prater based on its mischaracterization that Hounschell

differentiated between the collective efforts of the gang and individuals' side dealings. I cannot

agree. Perhaps Hounschell did not know that Prater was selling crack cocaine, but Hounschell

knew that he himself was selling crack cocaine as part of the Vice Lord's larger operations. In his

testimony, Hounschell admitted that he sold crack cocaine as part of the Vice Lords conspiracy:

> Q. And you sold crack cocaine as part of this drug trafficking organization; correct? You sold crack cocaine? You were a Vice Lord; right?
>
> A. Yes, sir.
>
> Q. And as of the day that you were arrested, how long had you been selling crack cocaine?
>
> A. A few years.
>
> Q. A few years? And the sale of crack cocaine was something, again, that you did as a Vice Lord?
>
> A. I did it while I was a Vice Lord, yeah.

21

Q.      You did it while you were a Vice Lord.  That's one of the drugs that the Vice Lords were engaged in selling during the time that you were in the Vice Lords; right?

A.      Not predominantly, no.

Q.      No?

A.      But -- no.

Q.      But it happened; right?

A.      I'm pretty sure it did.

Q.      And some of the monies that you received from the proceeds of selling crack cocaine, you paid those as dues into the box; right?

A.      I would think so, yeah.

Q.      Because it was benefitting the Vice Lords for you to do so; right?

A.      Yes, sir.

* * *

Q.      And prior to your arrest, how often did you sell crack cocaine?

A.      Not much.

Q.      Okay.  Just something you did in addition to the other drugs that you were dealing with as a part of this conspiracy?

A.      Yes, sir.

Q.      Okay.  Can you tell us how much money you made, you know, on a weekly or monthly or whatever basis during the course of this conspiracy?  How much did you make selling crack -- make off of selling crack?

A.      Not too much of nothin'.

Q.      Okay.  Hundreds a month?

A.      2-, 300 a month.

Q.      Okay.  All right.  Now, were there other Vice Lords in addition to yourself who were selling crack cocaine as part of this conspiracy?

A.      Not that I know of.

In targeting one drug-trafficking organization, federal law enforcement officers in their warrant affidavits viewed the co-conspirators for the Case No. 152 conspiracy as the same co-conspirators for the Case No. 151 conspiracy.  Moreover, the government does not rebut this

22

relationship. On the contrary, it concedes that it does not know who the co-conspirators were in Case No. 152. And the majority's superficial observation that Prater is "the only individual named in both conspiracies" misses the point. Because the government bears the burden of proof and did not establish that the unnamed co-conspirators in Case No. 152 were anyone other than Prater's co-conspirators from Case No. 151, this factor favors a single conspiracy.

*Offenses Charged.* This factor again favors Prater, which both the government and the majority opinion concede.

Where "precisely the same statutory offenses" are charged, this factor favors a single conspiracy. *In re Grand Jury Proc.*, 797 F.2d at 1382; *Meda*, 812 F.3d at 509. The two indictments here identically charged Prater with conspiracy to possess with intent to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846, albeit different types of controlled substances. The Case No. 151 indictment alleges that the drugs at issue in the larger conspiracy were methamphetamine, fentanyl, oxycodone, alprazolam (Xanax), marijuana, buprenorphine, and heroin. The Case No. 152 indictment alleges a conspiracy that involved only crack cocaine.

But that is a distinction without a difference. A § 846 drug conspiracy requires an agreement to violate drug laws, *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009), and here, the predicate drug law is § 841(a). It is that section, and that section alone, that sets forth the "complete offense" of drug trafficking. *United States v. Mahaffey*, 983 F.3d 238, 243 (6th Cir. 2020) (internal quotation marks omitted). All that is required is that a defendant "knowingly possess"—or in this case, conspire to possess—"a controlled substance." *Id.* (internal quotation marks and emphases omitted). The exact type and quantity of the controlled substance is irrelevant from an offense standpoint and matters only instead with respect to § 841(b)'s sentencing regime. *See id.* at 243–44.

23

The Case No. 151 indictment illustrates the point. If mere differences in the types of drugs distributed could generate separate conspiracy counts for each drug, then the Case No. 151 indictment would have charged seven counts for the seven different kinds of drugs. That it charged one count under § 841(a)(1) and § 846 for poly-drug conspiracy—and resulted in convictions on that conspiracy count—demonstrates that the nature of this single conspiracy was to acquire and sell many types of drugs. And the fact that the offense charged in Case No. 152 is identical is indicative that Prater's distribution of crack cocaine was, in fact, part of the larger, multi-drug conspiracy.

When two "indictments require proof of the same elements, using the same facts, and only vary[] as to the type and amount of controlled substance involved," we have concluded that this factor weighs "heavily" in favor of "a single, unified conspiracy" to distribute controlled substances. *Corral v. United States*, 562 F. App'x 399, 406–07 (6th Cir. 2014). Put differently, "a showing that the same predicate crimes were committed under different factual circumstances only tends to prove that the pattern of activity was more widespread than the initial indictment originally conveyed. It does not tend to prove a separate pattern of conduct." *Wheeler*, 535 F.3d at 454; *see also United States v. Scott*, 760 F. App'x 151, 155 (4th Cir. 2019) (describing different types of controlled substances alleged in two indictments as a "minor distinction" between the two); *United States v. Shepard*, 89 F. Supp. 2d 884, 888–89 (W.D. Mich. 1999) (where a defendant was charged "with a conspiracy involving marijuana" and then separately "charged with a conspiracy involving marijuana as well as cocaine and heroin," "[a] single agreement to conspire could encompass marijuana, cocaine, and heroin"); *cf. United States v. Powell*, 894 F.2d 895, 898–99 (7th Cir. 1990) (finding multiplicitous two conspiracy counts, one for trafficking methamphetamine and the other for cocaine).

24

*Overt Acts Charged/Scope of Activity.* This factor favors Prater.

Next is "whether the particular acts alleged in the indictment" in Case No. 152 "are part of a larger, unified conspiracy" from Case No. 151. *Sinito*, 723 F.2d at 1258. Unified conspiracies require "assent of its members to contribute to a common enterprise." *United States v. Kelley*, 849 F.2d 999, 1003 (6th Cir. 1988) (citation omitted). "Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership." *Id.* (internal quotation marks omitted). Evidence of the "unity essential to a conspiracy," *id.*, can be found in the common goal of the conspirators and the purpose served by the co-conspirators' activities, *see United States v. Maddox*, 944 F.2d 1223, 1232 (6th Cir. 1991).

As with the co-conspirators factor, the indictment in Case No. 152 does not contain all the overt acts contained in the Case No. 151 indictment. But Prater's overt acts to distribute crack cocaine share the common goal and purpose with the larger drug conspiracy from Case No. 151: for Vice Lords to acquire and distribute controlled substances and to profit from that distribution. If differences in the particular types of drugs sold were given significant weight, then the government could simply charge different overt acts in different indictments for the same conspiracy, "arbitrarily" splitting unitary conspiracies into several prosecutions. *Sinito*, 723 F.2d at 1258. This conduct is exactly what the Double Jeopardy Clause prohibits.

On this point, *Corral* is instructive. There, the defendant was indicted first in California for a poly-drug-distribution conspiracy and later in Michigan for a cocaine-distribution conspiracy. 562 F. App'x at 400–01. The district court found that the overt acts were "clearly different," but we reversed, holding that "the district court's factual findings were clearly erroneous." *Id.* at 408. We observed that "[t]he overt acts charged in Michigan and California were all related to Corral's

25

purpose of distributing a controlled substance, which was the common goal of his co-conspirators." *Id.* So too here.

Yet, the majority opinion concludes to the contrary, juxtaposing the amounts and types of drugs involved in each alleged conspiracy. We have made the distinction in cases before, *see, e.g.*, *United States v. Kennedy*, 743 F. App'x 649, 653 (6th Cir. 2018) (noting that one charged conspiracy was "far more expansive in scope" than the other), but the record evidence here belies such an application. As set forth above, although the government charged two separate conspiracies, the government's investigation and trial evidence establish the Vice Lords acquired and distributed all sorts of drugs in all sorts of amounts. True, methamphetamine was their focus, but they also dealt crack cocaine. Most importantly, Hounschell admitted that, while the Vice Lords did "[n]ot predominantly" distribute crack cocaine, he was "pretty sure" they did distribute it.[2]

In sum, crack cocaine was not the Vice Lords' drug of choice, but it was one they trafficked. That they distributed many more doses of their primary product than of their ancillary products does not change the fact that the latter were part of the same conspiracy. Indeed, that is how the government charged and proved the case with respect to ancillary drugs like oxycodone, alprazolam, marijuana, buprenorphine, and heroin. The government offers no evidence that crack cocaine was not one of the other ancillary products in this drug conspiracy that predominantly, though not exclusively, distributed methamphetamine.

---

[2]The majority opinion seemingly faults Prater for lacking evidence that "the Vice Lords integrated [crack cocaine] into their business model." But that ignores the burden of proof—it is the government's burden to establish that crack cocaine was not part of the Vice Lords' business model.

*Location.*  This factor again favors Prater.

Both indictments alleged that the conspiracies' activities occurred "in the Eastern District of Tennessee and elsewhere."  And the wiretap affidavits make clear that the government's investigation targeted the Knoxville chapter of the Vice Lords.  As the trial testimony elaborated, many of the central characters in the Case No. 151 conspiracy—defendants Alim and Ronald Turner, Gilmore, Stewart, and Prater—were largely located in Knoxville.  "When two alleged conspiracies overlap geographically, it is appropriate to consider where they are based as an indicator of whether the geographic overlap is significant." *Rabhan*, 628 F.3d at 208.  Both alleged conspiracies here were based not only in the Eastern District of Tennessee, but more specifically in Knoxville.  *See id.* (finding only a single conspiracy where Georgia was a "base" of operations for both alleged conspiracies).

It is true that the conspiracy charged in Case No. 151 encompassed additional jurisdictions, but only because one of the co-conspirators (Ronald Turner) was in prison and because the Vice Lords sourced some of their drugs from California and elsewhere in Tennessee.  Accordingly, the geographic scope of activities relating to Case No. 152 is more limited than the geographic scope of activities relating to Case No. 151 because the former pertains to only a subset of the latter.  *See United States v. Maslin*, 356 F.3d 191, 197 n.2 (2d Cir. 2004) ("That the Binghamton case included more proof about the additional sales of lower grade marijuana from the south does not make it a separate conspiracy.").

\* \* \*

The totality of the circumstances—indeed, every factor weighs in Prater's favor—demonstrates that the Case No. 152 conspiracy was part of the larger Case No. 151 conspiracy.  The government has failed to meet its burden by a preponderance of the evidence to establish that

there were two separate conspiracies. Prater's prosecution in Case No. 151 thus violated the Double Jeopardy Clause.

Our decision in *Wheeler* is not to the contrary. 535 F.3d at 446. There, the defendant was charged with three drug-trafficking-conspiracy counts, two in Florida and one in Ohio. *Id.* at 449. In the Florida prosecution, he was acquitted of one of the drug-conspiracy counts (the other was dismissed). He challenged the later Ohio prosecution on double-jeopardy grounds, arguing that it charged the same conspiracy as the one for which he had already been acquitted. *Id.* On de novo review, we found no double-jeopardy violations with the Ohio drug-conspiracy charge and conviction. *Id.* at 449, 456–58. We reasoned that, even though all counts involved the same statutory offense (§§ 841(a), 846), none of the other factors pointed in the defendant's favor. The Ohio conspiracy and Florida conspiracies did not significantly overlap in terms of time, participants, scope, or location. *Id.* at 456–58.

True, how *Wheeler* distinguished the scope of the various conspiracies in terms of drug differences is what the majority says about Prater's appeal here. There, the Ohio conspiracy involved the distribution of numerous drugs (including cocaine, methamphetamine, LSD, marijuana, ecstasy, and valium), while one Florida conspiracy involved only cocaine and the other involved cocaine and methamphetamine. *Id.* at 456–57. But here, as set forth above, the indictments and factual record developed at trial established no delineation between the drugs peddled by the Vice Lords. Although crack cocaine was not the "predominant[]" drug the Vice Lords distributed, it was one of the many controlled substances they acquired and sold as part of their drug-distribution conspiracy. In sum, *Wheeler*'s balancing of the *Sinito* factors based on different facts is immaterial to Prater's case on de novo review.

28

IV.

For these reasons, I would vacate Prater's conviction for Count One in Case No. 151. And because his conviction on Count Two was predicated upon Count One, I would vacate that conviction as well. Remaining then would be Prater's convictions for Counts Four (aiding and abetting the attempted possession with intent to distribute methamphetamine) and Six (distributing methamphetamine). With Counts One and Two vacated, I would remand for plenary resentencing. *See, e.g*, *United States v. Faulkenberry*, 461 F. App'x 496, 502 (6th Cir. 2012).[3]

For these reasons, I respectfully dissent.

---

[3]Because I would vacate Counts One and Two and remand for resentencing, I would not reach the other two issues Prater raised on appeal—the sufficiency of the evidence supporting his Count Two conviction and the reasonableness of the district court's calculation of his Guidelines range at sentencing.